1

**SCOTT A. SCHIFF (SBN 137245)**
**SOUKUP & SCHIFF, LLP**

2

**16255 Ventura Blvd., Suite 708**
**encino, California 91436**

3

**Tel.: (310) 276-2026**
**Fax: (310) 286-0522**

4

**Email: sas@soukup-schiff.com**

5

*Attorneys for* National Loan Acquisitions Company

6

7

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

8

**SANTA ANA DIVISION**

9

10

In re:

Chapter 13

11

12

PHILIP H. INMAN,

Case No. 8:24-bk-10285-MH

13

            Debtor.

Judge: Hon. Mark D. Houle

14

15

**NATIONAL LOAN ACQUISITIONS**
**COMPANY'S OBJECTIONS TO**
**CONFIRMATION OF DEBTOR'S ORIGINAL**

16

**CHAPTER 13 PLAN; DECLARATION OF**
**COLIN THOMPSON; DECLARATION OF**

17

**SCOTT A. SCHIFF**

18

19

Confirmation Hearing

20

Date:   March 28, 2024
Time:  10:30 a.m.

21

Place:  Courtroom 6C
          411 W. Fourth Street

22

          Santa Ana, CA 92701

23

24

TO THE HONORABLE MARK A. HOULE, UNITED STATES BANKRUPTCY JUDGE,

25

DEBTOR PHILIP H. INMAN AND HIS ATTORNEY OF RECORD, THE CHAPTER 13

26

TRUSTEE, AND ALL PARTIES IN INTEREST:

27

28

1

National Loan Acquisitions Company ("NLAC") objects to and opposes confirmation of the Original Chapter 13 Plan ("Plan") filed by the Debtor Philip H. Inman (the "Debtor"), and urges this Court to deny confirmation of the Plan and dismiss Debtor's bankruptcy case.

**I.**

**FACTS**

1. NLAC is the holder of a certain Equity Line of Credit Agreement dated December 22, 2005, in the original principal amount of $290,000.00 on which Debtor is the obligor (the "Loan"). (Declaration of Colin Thompson ("Thompson Dec."), par. 4.)

2. The monthly payment on the Loan is $2,432.77. (Thompson Dec., par. 5.)

3. The Loan is secured by a Deed of Trust recorded against Debtor's residence at 2042 Palemetto Terrace, Fullerton, California 92831 (the "NLAC Deed of Trust"). The Deed of Trust was recorded on December 27, 2005. (Thompson Dec., par. 6.)

4. As of February 5, 2024 (Debtor's Petition Date), the total principal, interest, fees, and cost owing on the Loan was $271,326.00. (Thompson Dec., par. 7; Proof of Claim 3.)

5. As of the Debtor's Petition Date, the total arrearages on the Loans were $24,959.07. (Thompson Dec., par. 8.)

6. Debtor's principal residence is the real property at 2042 Palemetto Terrace, Fullerton, California 92831 ("Debtor's Residence"). (Docket Nos. 1 and 12.)

7. Debtor's Schedule D incorrectly states that NLAC holds a **first** Deed of Trust on the real property known as 12066-68 Downey Ave., Downey, California 90241 (the "Downey Property") and that the amount of NLAC's claim is $251,732.09. (Docket No. 12.)

8. Debtor's Schedules list no Deeds of Trust against the Downey Property other than incorrectly stating that the NLAC Deed of Trust is a lien against the Downey Property.

9.      Debtor's Schedule D states that Planet Home Lending holds a **first** Deed of Trust on Debtor's Residence (the "Planet Deed of Trust").  (Docket No. 12.)

10.      Debtor's Schedules list no Deeds of Trust against Debtor's Residence other than Planet Deed of Trust.  (Docket No. 12.)

11.      Debtor's Schedule J, Part 2, No. 4 states that Debtor's home ownership expense for his residence is $1,495.00.  (Docket No. 12.)  Other than the foregoing expense, there are no other loan or rent expenses with respect to Debtor's Residence showing on Schedule J.

12.      Debtor testified at his Meeting of Creditors that the monthly payment to Planet Home Lending (holder of first Deed of Trust on Debtor's Residence) is $1,480.00.  (Declaration of Scott A. Schiff ("Schiff Dec."), par. 2.)

13.      The 13 Plan lists only two creditors in Class 2, namely Pinehurst at Coyote Hill ("Pinehurst") and Planet Home Lending.  (Docket No. 15.)  Schedule D states that Pinehurst is the Homeowners Association with respect to Debtor's Residence.

14.      NLAC is listed in Class 4 of the Plan with $0.00 arrearage, notwithstanding the facts that NLAC's loan is secured by Debtor' Residence and that NLAC's Loan matures after the final plan payment.

15.      There are three Deeds of Trust recorded against Debtor's Residence. The first Deed of Trust is in favor of MTGLQ Investors, L.P., the second Deed of Trust is the NLAC Deed of Trust, and the third Deed of Trust is in favor of American Surety Company.  (Thompson Dec., par. 9.)  The Plan and Schedules refer to the holder of the First Deed of Trust on Debtor's Residence as "Planet Home Lending," which appears to be the servicer of the First Deed of Trust on Debtor's Residence.

16.      There are *likely* two Deeds of Trust recorded against Debtor's 50% interest in the Downey Property.  First, Debtor's Schedule J, Part 2, No. 17c states that there is a Deed of Trust on the Downey Property, and Debtor characterizes said Deed of Trust as "1st" trust deed.  Additionally,

3

at his Meeting of Creditors, Debtor stated that he has loan from PKN Investments ("PKN") that is secured by his 50% interest in the Downey Property.  (Schiff Dec., par. 3.)  Second, NLAC's counsel is informed and believes that there is another Deed of Trust in favor of PKN that is secured by Debtor's 50% interest in the Downey Property.  (Schiff Dec., par. 4.)  NLAC's counsel is informed and believes that PKN holds a first position Deed of Trust securing a loan in the original amount of $90,000.00 and second position Deed of Trust securing a loan in the original amount of $210,000.00. (Schiff Dec., par. 4.)

17.    Debtor testified at his Meeting of Creditors that PKN is owed approximately $220,000.00, that the payment on that loan is $1,837.50 a month, and that loan is secured by his 50% interest in the Downey Property.  (Schiff Dec., par. 3.)  Debtor's Schedule J, Part 2, No.17c states the payment on the first Deed of Trust on the Downey Property as $1,837.50.  Other than the foregoing expense, there are no other loan payments with respect to the Downey Property showing on Schedule J.

18.    The Petition does not list PKN as a creditor.

19.    The Plan does not account for PKN.

20.    Debtor's Schedule I lists two sources of income: Social Security of $2,197.90 and Rental Income from the Downey Property of $5,667.77.  Debtor provides nothing to substantiate the rental income.

21.    Debtor has not filed tax returns for 2018, 2020, 2021, 2022 and 2023.  (Proof of Claim 1 filed by Internal Revenue Service.)

//

//

//

//

## II.

## THE PLAN DOES NOT SATISFY 11 U.S.C SEC. 1325

A.    The Plan Does Not Satisfy 11 U.S.C. Section 1325(a)(5)

Section 1325(a)(5) can be satisfied by the Plan meeting the requirements of either subsection (A), (B), or (C). Subsection A is not satisfied because NLAC does not accept the Plan. Subsection (C) is not satisfied because the Debtor is not surrendering his residence to NLAC. Subsection (B) is not satisfied because the Plan proposes no payment on NLAC's arrearage as required by Section 1325(a)(5)(B)(ii).

B.    The Plan Does Not Satisfy 11 U.S.C. Section 1325(a)(6)

Pursuant to Section 1325(a)(6) the Plan can only be confirmed if "the debtor will be able to make all payments under the plan and to comply with the plan." Debtor cannot satisfy Section 1325(a)(6) because:

1.    There is absolutely no evidence that Debtor receives any income in excess of monthly Social Security payments of $2,197.90 (at the Meeting of Creditors, the Trustee indicated that Debtor provided proof of Social Security income).

2.    Assuming, *arguendo*, that Debtor receives $5,667.77 of income from the Downey Property as represented in Schedule I, that income will not be enough to make plan payments because:

(a)    the Plan does not provide for payment of NLAC's arrearage, and once that is taken into account, the monthly net income will not be sufficient;

(b)    Schedule J lists the mortgage payment on Debtor's residence at $1,495.00 (Debtor testified that it is $1,480), NLAC's payment is $2,432.77, Schedule J shows monthly net income of only $590.27, and therefore there's not enough income to even make the payment to

5

NLAC;

(c)    Schedule J only includes one payment to PKN (see line 17.c) and indicates that the payment is for the first PKN Deed of Trust; and there is no payment on the second PKN Deed of Trust.

3.    The Plan does not account for payment of the IRS debt.

Accordingly, taking into account any or all of the arrearages owing to NLAC, NLAC's regular loan payment, the unknown payment on PKN's second Deed of Trust, and the IRS debt, the Plan is not feasible, and that is assuming that the Debtor receives $5,667.77 of monthly income from the Downey Property.  If the actual amount received from the Downey Property is less, the Plan is further underwater.

C.    The Plan Does Not Satisfy 11 U.S.C. Section 1325(a)(7)

Section 1325(a) requires that the Petition be filed in good faith.  The Petition was not filed in good faith because:

1.    The Plan improperly classifies NLAC's claim.

2.    The Plan does not account for NLAC's arrearage.

3.    Schedule J does not accurately reflect Debtor's expenses, as it fails to include:

(a)    The monthly payment to NLAC of $2,432.77.

(b)    A monthly payment for the loan secured by a second Deed of Trust in favor of PKN.

4.    The Petition does not list PKN as a creditor, as such PKN was not served with Notice of the case.

5.    Schedule D does not list either of the Deeds of Trust in favor of PKN.

6.    Schedule D does not list the third Deed of Trust in favor of American Surety Company.

7.    The Petition grossly understates Debtor's debt to the IRS.

8.    The Plan does not account for IRS debt.

9.    The Plan does not account for PKN.

10.    The Petition and the Plan, taken at face value, create the impression that the Plan can be funded, when in fact, the Plan is an impossibility.

D.    The Plan Does Not Satisfy 11 U.S.C. Section 1325(a)(9)

11 U.S.C. Section 1325(a)(9) requires that Debtor file all tax returns as required by Section 1308. As indicated by the IRS Proof of Claim, Debtor has not filed tax returns for 2020 through 2023. Debtor has also not filed a tax return for 2018.

## III.

## CONCLUSION

Based upon the foregoing, the Court's records, and argument to be presented at the Confirmation Hearing, NLAC respectfully requests that the Court deny confirmation of Debtor's Plan and dismiss Debtor's bankruptcy case.

Dated: March 14, 2024                    SOUKUP & SCHIFF, LLP

                                        By: _____
                                            SCOTT A. SCHIFF, Attorneys for
                                            National Loan Acquisitions Company

## DECLARATION OF COLIN THOMPSON

I, Colin Thompson, declare:

1.      I am an Asset Manager of National Loan Acquisitions Company ("NLAC").  I make this declaration in support of NLAC's Objections to Debtor Philip H. Inman's Original Chapter 13 Plan.

2.      As an Asset Manager of NLAC, I am familiar with the procedures used by NLAC to account for the amounts owing on and the payments received and not made with respect to   Loans held by NLAC, as well as NLAC's procedures for the retention, storage, and retrieval of all information related to the above.   I have personal knowledge of the facts set forth below or have gained such knowledge of them from my personal examination of the business records of NLAC maintained in the ordinary course of business.  If called upon as a witness, I could and would competently testify thereto.

3.      NLAC is a corporation, located in and organized under the laws of the State of South Dakota.

4.      NLAC is the holder of a certain Equity Line of Credit Agreement dated December 22, 2005, in the original principal amount of $290,000.00 on which Philip H. Inman ("Debtor") is the obligor (the "Loan").  A true and correct copy of the Loan is attached hereto as Exhibit 1.

5.      The monthly payment on the Loan is $2,432.77.

6.      The Loan is secured by a Deed of Trust recorded against Debtor's residence at 2042 Palemetto Terrace, Fullerton, California 92831 (the "NLAC Deed of Trust").  The NLAC Deed of Trust was recorded on December 27, 2005.  A true and correct copy of the recorded NLAC Deed of Trust is attached hereto as Exhibit 2.

7.      As of February 5, 2024 (Debtor's Petition Date), the total principal, interest, fees, and cost owing on the Loan was $271,326.00.

8.    As of the Debtor's Petition Date, the total arrearages on the Loans were $24,959.07.

9.    There are three Deeds of Trust recorded against Debtor's Residence. The first Deed of Trust is in favor of MTGLQ Investors, L.P.  The second Deed of Trust is the NLAC Deed of Trust. The third Deed of Trust is in favor of American Surety Company.  These Deeds of Trust are reflected on the Trustee's Sale Guarantee issued to NLAC dated September 29, 2023 (the "Guarantee").  A true and correct copy of the Guarantee is attached hereto as Exhibit 3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of March, 2024, at Rapid City, South Dakota.

Colin Thompson

9

# EQUITY ACCESS LINE OF CREDIT AGREEMENT

2993 

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $290,000.00 | 12-22-2005 | 12-22-2030 | 6613025535 | 1100 | 265005 | PG | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  PHILIP H. INMAN
2042 PALMETTO TERRACE
FULLERTON, CA  92831

**Lender:**  Fullerton Community Bank, FSB
Note Department
200 W. Commonwealth Avenue
Fullerton, CA  92832
(714) 578-7500

**CREDIT LIMIT:  $290,000.00**                          **DATE OF AGREEMENT:  December 22, 2005**

**Introduction.**  This EquityAccess Line of Credit Agreement ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through Fullerton Community Bank, FSB.  In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above.  The words "we," "us," "our," "Beneficiary," and "Lender" mean Fullerton Community Bank, FSB.  **You agree to the following terms and conditions:**

**Promise to Pay.**  You promise to pay Fullerton Community Bank, FSB, or order, the total of all credit advances and  **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Deed of Trust" which secures your Credit Line.  You will pay your Credit Line according to the payment terms set forth below.  **If there is more than one Borrower, each is jointly and severally liable on this Agreement.**  This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower.  Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement.  We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.**  The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until December 22, 2030 ("Maturity Date").  All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity.  The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of California, following the expiration of the right to cancel, the perfection of the Deed of Trust, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows:  10 YEARS.  You may obtain credit advances during this period ("Draw Period").  After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances.  The length of the repayment period is as follows:  15 YEARS.  You agree that we may renew or extend the period during which you may obtain credit advances or make payments.  You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.**  Your "Regular Payment" will equal the amount of your accrued **FINANCE CHARGES** ("First Payment Stream").  You will make 120 of these payments.  Your payments will be due monthly.  Your "Minimum Payment" will be the Regular Payment, plus any amount due and all other charges.  An increase in the **ANNUAL PERCENTAGE RATE** may increase the amount of your Regular Payment.

After completion of the First Payment Stream, your "Regular Payment" will be based on an amortization of your balance at the start of this payment period as shown below or $100.00, whichever is greater ("Second Payment Stream").  Your payments will be due monthly.

| Range of Balances | Number of Payments | Amortization Period |
|---|---|---|
| All Balances | 180 | 180 payments |

Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges.

A change in the **ANNUAL PERCENTAGE RATE** can cause the balance to be repaid more quickly or more slowly.  When rates decrease, less interest is due, so more of the payment repays the principal balance.  When rates increase, more interest is due, so less of the payment repays the principal balance.  If this happens, we may adjust your payment as follows:  your payment may be increased by the amount necessary to repay the balance by the end of this payment stream.  Each time the **ANNUAL PERCENTAGE RATE** changes, we will review the effect the change has on your Credit Line Account to see if your payment is sufficient to pay the balance by the Maturity Date.  If it is not, your payment may be increased by an amount necessary to repay the balance by the Maturity Date.

In any event, if your Credit Line balance falls below $100.00, you agree to pay your balance in full.  You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**How Your Payments Are Applied.**  Unless otherwise agreed or required by applicable law, payments and other credits will be applied to FIRST TO LATE CHARGES, THEN TO OTHER CHARGES, THEN TO FINANCE CHARGES, THEN TO UNPAID PRINCIPAL.

**Receipt of Payments.**  All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement.  Payments received at that address prior to 5:00 p.m. Pacific Time on any business day will be credited to your Credit Line as of the date received.  If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

**Credit Limit.**  This Agreement covers a revolving line of credit for the principal amount of Two Hundred Ninety Thousand & 00/100 Dollars ($290,000.00), which will be your "Credit Limit" under this Agreement.  **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.**  You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit.  Your Credit Limit is the maximum amount you may have outstanding at any one time.  You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit.  Your Credit Limit will not be increased should you overdraw your Credit Line Account.  If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you.  Any credit advances in excess of your Credit Limit will not be secured by the Deed of Trust covering your principal dwelling.

**Charges to Your Credit Line.**  We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Deed of Trust or any other document related to your Credit Line.  In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Deed of Trust for this transaction.  We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling.  These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling.  If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes.  Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line.  However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.**  After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.**  Writing a preprinted "EquityAccess Check" that we will supply to you.

**Telephone Request.**  Requesting a credit advance from your Credit Line to be applied to your designated account by telephone.  Except for transactions covered by the Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, **you acknowledge and agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.**

**Requests By Mail.**  Requesting an advance by mail.

**Requests in Person.**  Requesting a credit advance in person at any of our authorized locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.**  We reserve the right not to honor EquityAccess Checks in the following circumstances:

**Credit Limit Violation.**  Your Credit Limit has been or would be exceeded by paying the EquityAccess Check.

**Post-dated Checks.**  Your EquityAccess Check is post-dated.  If a post-dated EquityAccess Check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.**  Your EquityAccess Checks have been reported lost or stolen.

**Unauthorized Signatures.**  Your EquityAccess Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.**  Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the EquityAccess Check.

10

DECLARATION OF COLIN THOMPSON
EXHIBIT 1

## EQUITY ACCESS LINE OF CREDIT AGREEMENT

Loan No: 6613025535     (Continued)     Page 2

**Transaction Violation.** Your EquityAccess Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the EquityAccess Check.

If we pay any EquityAccess Check under these conditions, you must repay us, subject to applicable laws, for the amount of the EquityAccess Check. The EquityAccess Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return EquityAccess Checks along with your periodic billing statements; however, your use of each EquityAccess Check will be reflected on your periodic statement as a credit advance. We do not "certify" EquityAccess Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

     **Credit Line EquityAccess Check, Telephone Request, Request By Mail and In Person Request Limitations.** The following transaction limitations will apply to your Credit Line and the writing of EquityAccess Checks, requesting an advance by telephone, requesting an advance by mail and requesting an advance in person.

         **Minimum Advance Amount.** The minimum amount of any credit advance that can be made on your Credit Line is $300.00. This means any EquityAccess Check must be written for at least the minimum advance amount.

**Authorized Signers.** The words "Authorized Signer" on EquityAccess Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost EquityAccess Checks.** If you lose your EquityAccess Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (714) 578-7500. You also can notify us at our address shown at the beginning of this Agreement.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Deed of Trust dated December 22, 2005, to a trustee in favor of us on real property located in ORANGE County, State of California. That agreement contains the following due on sale provision: We may, at our option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without our prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by us if such exercise is prohibited by applicable law.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Deed of Trust, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic **FINANCE CHARGES** for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a **FINANCE CHARGE** on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily **FINANCE CHARGE** will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any **FINANCE CHARGE** is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic **FINANCE CHARGES** for each day in the billing cycle. This is your **FINANCE CHARGE** calculated by applying a Periodic Rate.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. Initially, we will apply the discounted rates shown herein. Thereafter, we start with an independent index which is the Wall Street Journal Prime Rate (the "Index"). We will use the most recent Index value available to us as of 45 days prior to the rate change any **ANNUAL PERCENTAGE RATE** adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index, which is beyond our control, after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we take the value of the Index, round that to the nearest 0.125%, then divide the rounded value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE** for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we take the value of the Index, round that to the nearest 0.125%, then divide the rounded value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE** for your Second Payment Stream. The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect on your monthly cycle date, based on the Index in effect on that date. After the initial discount period is completed, the corresponding **ANNUAL PERCENTAGE RATE** cannot be less than 4.000% per annum. In no event will the corresponding **ANNUAL PERCENTAGE RATE** be more than the lesser of 18.000% or the maximum rate allowed by applicable law. Today the Index is 7.250% per annum, and therefore the initial Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line are as stated below:

**Rates During the Discount Period**

| Term of Discount Range of Balances | Discounted Rate | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| First 6 payments | | | |
| All Balances | 5.250% | 5.250% | 0.01438% |

The term of the discount period is 6 payments.

**Current Non-discounted Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.000% | 7.250% | 0.01986% |

**Current Non-discounted Rates for the Second Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.000% | 7.250% | 0.01986% |

11

DECLARATION OF COLIN THOMPSON
EXHIBIT 1

## EQUI.. ACCESS LINE OF CREDIT AGRE..MENT

Loan No: 6613025535                      (Continued)                                      Page 3

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

**Conversion Option.** This Agreement contains an option to convert the interest rate from a variable rate with interest rate limits to a fixed rate as calculated below. The following information is representative of conversion features recently offered by us.

**ANNUAL PERCENTAGE RATE Increase.** Your **ANNUAL PERCENTAGE RATE** may increase if you exercise this option to convert to a fixed rate.

**Conversion Periods.** You can exercise the option to convert to a fixed rate only during the following period or periods: You may convert all or part of the outstanding principal balance on your line of credit to a fixed rate loan from the commencement of the line of credit to the Repayment Maturity Date. The date on which the Repayment Period would end, assuming only one ten (10) year Draw Period is referred to herein as the "Repayment Maturity Date".

**Conversion Fees.** You will be required to pay the following fees at the time of conversion to a fixed rate: You will be charged a conversion fee of $50.00 upon the exercise of each fixed rate option.

**Rate Determination.** The fixed rate will be determined as follows: The ANNUAL PERCENTAGE RATE that will apply to each fixed rate loan is based on the value of an Index plus a margin that we will establish at the time of the exercise of each fixed rate option, but which shall not exceed eight percentage (8%) points over the Index value. The Index is the Prime Rate as published in the Wall Street Journal. If this Index should become unavailable, we will substitute a new Index which has historically similar movements to Prime Rate.

**Conversion Rules.** You can convert to a fixed rate only during the period or periods described above. In addition, the following rules apply to the conversion option under this Agreement: 1) You may have only three (3) Fixed Rate Loans outstanding at any one time, and a maximum of six (6) fixed rate loans between the commencement date and repayment maturity date of your revolving line of credit. Any outstanding fixed rate loan(s) will reduce the amount otherwise available under the line of credit.
2) Payments required on fixed rate loans are separate from, and in addition to, the Minimum Monthly Payment of your line of credit. Repayments will restore availability on the line of credit during the draw period on a quarterly basis.
3) The minimum amount of each fixed rate loan shall be $5000.00. Fixed rate loans will have a term and amortization to be agreed upon by you and us but not to exceed the following ranges:

Fixed Rate Advance:

| Amount | Term | Amortized |
|---|---|---|
| $5,000.00-$24,999.99 | 15 Years | 15 Years* |
| $25,000.00-$49,999.99 | 15 Years | 20 Years** |
| $50,000.00-and above | 15 Years | 30 Years** |

*Fully Amortized loan.
**Balloon payment required.

4)* You will be required to pay 180 equal monthly installments plus any unpaid fees and charges and past due amount. **You will be required to pay 179 equal monthly payments with one balloon payment due at maturity for any unpaid principal and interest due plus any unpaid fees, charges and past due amount. Fixed rate loans with a ballon payment will be amortized over 20 year or 30 year period based on the loan amount. When the Fixed Rate Loan matures the remaining unpaid balance (Balloon Payment) will be added to the balance of the line of credit.
5) In no case shall the maturity date for any Fixed Rate Loan extend for a term beyond the Repayment Maturity Date.
6) Fixed Rate Options may not be exercised if you are in default on your line of credit or any existing Fixed Rate Loan(s).

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Annual Fee.** A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: Annually; waived if average balance is $20,000.00 or more .

**Late Charge.** Your payment will be late if it is not received by us within **15 days after the "Payment Due Date" shown on your periodic statement.** If your payment is late we may charge you 5.000% of the payment.

**Lien Release Fees.** In addition to all other charges, you agree, to the extent not prohibited by law, to pay all fees for release of our security interests in collateral securing your Credit Line. You will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $45.00. This amount includes the standard charge imposed by the county recorder for recording the reconveyance.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (A) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (B) You do not meet the repayment terms of this Credit Agreement. (C) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

    (1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

    (2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

    (3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

    (4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

    (5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

    (6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have a historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. You also will pay any court costs, in addition to all other sums provided by law.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all EquityAccess Checks and any other access devices. Any use of EquityAccess Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of EquityAccess Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all EquityAccess Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all

DECLARATION OF COLIN THOMPSON
EXHIBIT 1

## EQUITY ACCESS LINE OF CREDIT AGREEMENT

| Loan No: 6613025535 | (Continued) | Page 4 |
|---|---|---|

amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Fullerton Community Bank, FSB, 200 W. Commonwealth Avenue Fullerton, CA 92832.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that, upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Deed of Trust. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Fullerton Community Bank, FSB Attn: Berdie Chavez/Note Department Manager 200 W. Commonwealth Avenue Fullerton, CA 92832.

**Jury Waiver. We and you hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either us or you against the other.**

**Early Closure Fees.** If you close your line of credit at any time during the first 3 years after the line of credit opening date, then we may collect an Early Closure Fee of $500.00. We will not collect the Early Closure Fee if you close your line of credit any time between the first and third anniversary date of the line of credit opening date, as a result of your sale of the property securing the line of credit

**AUTOMATIC PAYMENT RATE REDUCTION PROVISION.** Your rate has been reduced by 1/4 % by your agreeing to have payments to this loan be charged automatically from your account held at Fullerton Community Bank. This rate reduction will be revoked if, at any time, this agreement is cancelled by either party. At that time, your remaining balance on this loan will be reamortized, and payments will be adjusted accordingly.

**Governing Law. This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of California.**

**Choice of Venue.** If there is a lawsuit, you agree upon our request to submit to the jurisdiction of the courts of Orange County, State of California.

**Interpretation.** You agree that this Agreement, together with the Deed of Trust, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Deed of Trust or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

BORROWER:

X _____
    PHILIP H. INMAN

Effective Disbursement Date: _12/27/05_____

DECLARATION OF COLIN THOMPSON
EXHIBIT 1

### EQUITY ACCESS LINE OF CREDIT AGREEMENT

**Loan No: 6613025535**        (Continued)        Page 5

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

> **Fullerton Community Bank, FSB**
> **Attn: Teresa Ruiz**
> **200 W Commonwealth Avenue**
> **Fullerton, CA 92832**

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

LASER PRO Lending, Ver. 5.20.00.002  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - CA  F:\CFWIN\CFILFL\D28LFC  TR-9410  PR-HELOC

DECLARATION OF COLIN THOMPSON
EXHIBIT 1

**ALLONGE**

FOR VALUE RECEIVED, the undersigned, the successor by merger to Fullerton Community Bank, FSB, the original payee under that certain Equity Access Line of Credit Agreement dated as of December 22, 2005, given by Philip H. Inman, an individual, in the principal amount of $290,000.00 to which this Allonge is affixed (the "**Note**"), hereby absolutely assigns, transfers, endorses, negotiates, and sets over to and makes payable to the order of NATIONAL LOAN ACQUISITIONS COMPANY, WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, the Note, all interest, principal, and other sums due or to become due under the Note, and all other rights of any nature accrued or to accrue under the Note.

Dated: As of December 1, 2020.

IN WITNESS WHEREOF, the undersigned has executed this Allonge as of the date first referenced above.

PACIFIC PREMIER BANK,
a California commercial bank

By:     _____

Name:   _____

Title:  _____

DECLARATION OF COLIN THOMPSON
EXHIBIT 1

**This Document was electronically recorded by Lawyers Title Company B**

**RECORDATION REQUESTED BY:**

RECORDING REQUESTED BY
LAWYERS TITLE CO.

Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ 33.00

**2005001029858** 01:43pm 12/27/05

117 8 D11 10
0.00 0.00 0.00 0.00 27.00 0.00 0.00 0.00

**WHEN RECORDED MAIL TO:**
Fullerton Community Bank, FSB
Note Department
200 W. Commonwealth Avenue
Fullerton, CA  92832

**SEND TAX NOTICES TO:**
PHILIP H. INMAN
2042 PALMETTO TERRACE
FULLERTON, CA  92831

**FOR RECORDER'S USE ONLY**

# DEED OF TRUST

**Variable Interest Rate**
**Revolving Line of Credit**

THIS DEED OF TRUST is dated December 22, 2005, among PHILIP H. INMAN, AN UNMARRIED MAN ("Trustor"); Fullerton Community Bank, FSB, whose address is Note Department, 200 W. Commonwealth Avenue, Fullerton, CA  92832 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and Full Service, Inc., whose address is 200 W Commonwealth, Fullerton, CA  92832 (referred to below as "Trustee").

**CONVEYANCE AND GRANT.** For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in** ORANGE County, State of California:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF**

The Real Property or its address is commonly known as  2042 PALMETTO TERRACE , FULLERTON, CA  92831.  The Assessor's Parcel Number for the Real Property is 285-311-15.

**REVOLVING LINE OF CREDIT.**  This Deed of Trust secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Trustor so long as Trustor complies with all the terms of the Credit Agreement. Notwithstanding the amount outstanding at any particular time, this Deed of Trust secures the total amount of the Credit Agreement. The unpaid balance of the revolving line of credit under the Credit Agreement may at certain times be Zero Dollars ($0.00).  A zero balance does not affect Lender's agreement to make advances to Trustor under the Credit Agreement.  Therefore, Lender's interest under this Deed of Trust will remain in full force and effect notwithstanding a zero balance on the Credit Agreement.  Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement.  It is the intention of Trustor and Lender that this Deed of Trust secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938.  In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF EACH OF TRUSTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST.  THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**PAYMENT AND PERFORMANCE.**  Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Credit Agreement, this Deed of Trust, and the Related Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.**  Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.**  Until the occurrence of an Event of Default, Trustor may  (1)  remain in possession and control of the Property;  (2)

16

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

# DEED OF TRUST
## (Continued)

**Loan No: 6613025535**

Page 2

use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Trustor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Trustor represents and warrants to Lender that: (1) During the period of Trustor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Trustor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Trustor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Trustor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Trustor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Trustor or to any other person. The representations and warranties contained herein are based on Trustor's due diligence in investigating the Property for Hazardous Substances. Trustor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Trustor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Trustor's ownership or interest in the Property, whether or not the same was or should have been known to Trustor. The provisions of this section of the Deed of Trust, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

## DEED OF TRUST
### (Continued)

Loan No: 6613025535

Page 3

---

Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender, together with such other hazard and liability insurance as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the Improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the maximum amount of your credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Trustor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Trustor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Deed of Trust also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust.

**Title.** Trustor warrants that: (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Trustor has made in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature and shall remain in full force and effect until such time as Trustor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

**DEED OF TRUST**
**(Continued)**

Loan No: 6613025535                                                                                      Page 4

---

**Existing Lien.** The lien of this Deed of Trust securing the Indebtedness may be secondary and inferior to an existing lien. Trustor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Trustor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Trustor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Trustor's obligations under the Credit Agreement, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

## DEED OF TRUST
### (Continued)

**Loan No: 6613025535**                                                                                   **Page 5**

═══════════════════════════════════════════════════════════════════════

**EVENTS OF DEFAULT.** Trustor will be in default under this Deed of Trust if any of the following happen: (A) Trustor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Trustor's income, assets, liabilities, or any other aspects of Trustor's financial condition. (B) Trustor does not meet the repayment terms of the Credit Agreement. (C) Trustor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Trustor's obligations under this Deed of Trust, after Trustor's failure to do so, that decision by Lender will not affect Lender's right to declare Trustor in default and to exercise Lender's remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Credit Agreement, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Credit Agreement or by law.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

## DEED OF TRUST
### (Continued)

**Loan No: 6613025535**                                                                                    **Page 6**

injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender will have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of ORANGE County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any person may change his or her address for notices under this Deed of Trust by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors. It will be Trustor's responsibility to tell the others of the notice from Lender.

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**ASSOCIATION OF UNIT OWNERS.** The following provisions apply if the Real Property has been submitted to unit ownership law or similar law for the establishment of condominiums or cooperative ownership of the Real Property:

**Power of Attorney.** Trustor grants an irrevocable power of attorney to Lender to vote in Lender's discretion on any matter that may come before the association of unit owners. Lender will have the right to exercise this power of attorney only after Trustor's default; however, Lender may decline to exercise this power as Lender sees fit.

**Insurance.** The insurance as required above may be carried by the association of unit owners on Trustor's behalf, and the proceeds of such insurance may be paid to the association of unit owners for the purpose of repairing or reconstructing the Property. If not so used by the association, such proceeds shall be paid to Lender.

**Compliance with Regulations of Association.** Trustor shall perform all of the obligations imposed on Trustor by the declaration submitting the Real Property to unit ownership, by the bylaws of the association of unit owners, or by any rules or regulations thereunder. If Trustor's interest in the Real Property is a leasehold interest and such property has been submitted to unit ownership, Trustor shall perform all of the obligations imposed on Trustor by the lease of the Real Property from its owner.

**EARLY CLOSURE FEES.** If you close your line of credit at any time during the first 3 years after the line of credit opening date, then we may collect an Early Closure Fee of $500.00. We will not collect the Early Closure Fee if you close your line of credit any time between the first and third anniversary date of the line of credit opening date, as a result of your sale of the property securing the line of credit

**LIEN RELEASE FEES.** In addition to all other charges, you agree, to the extent not prohibited by law, to pay all fees for release of our security interests in collateral securing your Note. You will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $45.00. This amount includes the standard charge imposed by the county recorder for recording the reconveyance.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** What is written in this Deed of Trust and in the Related Documents is Trustor's entire agreement with Lender concerning the matters covered by this Deed of Trust. To be effective, any change or amendment to this Deed of Trust must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

**DEED OF TRUST**
**(Continued)**

Loan No: 6613025535

Page 7

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.**

**Choice of Venue.** If there is a lawsuit, Trustor agrees upon Lender's request to submit to the jurisdiction of the courts of Orange County, State of California.

**No Waiver by Lender.** Trustor understands Lender will not give up any of Lender's rights under this Deed of Trust unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Trustor will not have to comply with the other provisions of this Deed of Trust. Trustor also understands that if Lender does consent to a request, that does not mean that Trustor will not have to get Lender's consent again if the situation happens again. Trustor further understands that just because Lender consents to one or more of Trustor's requests, that does not mean Lender will be required to consent to any of Trustor's future requests. Trustor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Deed of Trust is not valid or should not be enforced, that fact by itself will not mean that the rest of this Deed of Trust will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Deed of Trust even if a provision of this Deed of Trust may be found to be invalid or unenforceable.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**Waive Jury. All parties to this Deed of Trust hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following words shall have the following meanings when used in this Deed of Trust:

**Beneficiary.** The word "Beneficiary" means Fullerton Community Bank, FSB, and its successors and assigns.

**Borrower.** The word "Borrower" means PHILIP H. INMAN and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated December 22, 2005, **with credit limit of $290,000.00** from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of this Deed of Trust is December 22, 2030. **NOTICE TO TRUSTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means Fullerton Community Bank, FSB, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

**Loan No: 6613025535**

# DEED OF TRUST
## (Continued)

**Page 8**

owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means Full Service, Inc., whose address is 200 W Commonwealth, Fullerton, CA 92832 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means PHILIP H. INMAN.

**TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS, INCLUDING THE VARIABLE RATE PROVISIONS OF THE CREDIT AGREEMENT SECURED BY THIS DEED OF TRUST.**

**TRUSTOR:**

X _____
   **PHILIP H. INMAN**

---

# CERTIFICATE OF ACKNOWLEDGMENT

STATE OF _California_ )
                    ) SS
COUNTY OF _Orange_ )

On _December 22_, 20_05_ before me, _Lindsay Shrubb, Notary Public_, personally appeared **PHILIP H. INMAN,** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _Lindsay Shrubb_

> LINDSAY SHRUBB
> COMM # 1487507
> NOTARY PUBLIC - CALIFORNIA
> ORANGE COUNTY
> My Commission Expires May 3, 2008

(Seal)

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

**DEED OF TRUST**
**(Continued)**

Loan No: 6613025535

Page 9

---

### (DO NOT RECORD)
### REQUEST FOR FULL RECONVEYANCE
(To be used only when obligations have been paid in full)

To: _____, Trustee

The undersigned is the legal owner and holder of all Indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Credit Agreement secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

_____.

Date: _____    Beneficiary: _____

By: _____

Its: _____

LASER PRO Lending, Ver. 5.29.00.002 Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - CA  F:\CFI\WIN\CFI\LPL\G01.FC  TR-3410  PR-HELOC

DECLARATION OF COLIN THOMPSON
EXHIBIT 2



**LandAmerica
Lawyers Title**

Lawyers Title Company
18551 Von Karman Avenue
Suites 100-200
Irvine, CA  92612
Phone:  (949) 223-5575

## PENALTY OF PERJURY AFFIDAVIT
### (GOVERNMENT CODE 27361.7)

I CERTIFY UNDER THE PENALY OF PERJURY THAT THE NOTARY SEAL ON THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED READS AS FOLLOWS:

NAME OF NOTARY: _____*LINDSAY SHRUBB*_____

DATE COMMISSION EXPIRES: _____*MAY 3, 2008*_____

COUNTY WHERE BOND IS FILED: _____*ORANGE*_____

COMMISSION NO.: *1487507*  MANUFACTURER/VENDOR NO.: *# AERI*

PLACE OF EXECUTION: ___IRVINE, CA___ DATE: *12/27* ,20 *05*

SIGNATURE: _____
LAWYERS TITLE COMPANY

I FURTHER CERTIFY UNDER THE PENALTY OF PERJURY THAT THE ILLIGIBLE PORTION OF THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED READS AS FOLLOWS (IF APPLICABLE):

DATE:_____,20_____

SIGNATURE:_____
LAWYERS TITLE COMPANY

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

File No.:  **05429828**

## EXHIBIT "A"

All that certain real property situated in the County of Orange, State of California, described as follows:

LOT 16 OF TRACT NO. 14935, IN THE CITY OF FULLERTON, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 718, PAGES 40 TO 50 INCLUSIVE OF MISCELLANEOUS MAPS, AND BY CERTIFICATE OF CORRECTION RECORDED MARCH 27, 1995 AS INSTRUMENT NO. 95-0119503, OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Assessor's Parcel Number:  **285-311-15**

DECLARATION OF COLIN THOMPSON
EXHIBIT 2

File No.:  **05429828**

## EXHIBIT "A"

All that certain real property situated in the County of Orange, State of California, described as follows:

LOT 16 OF TRACT NO. 14935, IN THE CITY OF FULLERTON, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 718, PAGES 40 TO 50 INCLUSIVE OF MISCELLANEOUS MAPS, AND BY CERTIFICATE OF CORRECTION RECORDED MARCH 27, 1995 AS INSTRUMENT NO. 95-0119503, OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Assessor's Parcel Number:  **285-311-15**

DECLARATION OF COLIN THOMPSON
EXHIBIT 2



**TRUSTEE'S SALE GUARANTEE**

SUBJECT TO THE EXCLUSIONS FROM COVERAGE AND THE CONDITIONS ATTACHED HERETO AND
MADE A PART OF THIS GUARANTEE

**WFG NATIONAL TITLE INSURANCE COMPANY**
a South Carolina corporation, herein called the Company

GUARANTEES

the Assured named in Schedule A of this Guarantee

against loss or damage not exceeding the liability amount stated in Schedule A sustained by the Assured by reason
of any incorrectness in the assurances set forth in  Paragraph 3 of Schedule A.

**In Witness Whereof**, WFG NATIONAL TITLE INSURANCE COMPANY has caused this guarantee to be signed
and sealed by its duly authorized officers as of Date of Guarantee shown in Schedule A.

**WFG NATIONAL TITLE INSURANCE COMPANY**

By: _____
President

ATTEST: _____
Secretary

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

### TRUSTEE'S SALE GUARANTEE

### SCHEDULE A

Guarantee No.:    **3174406-7380247**                          Liability:   **$260,000.00**
File No.:         **2373813CAD**
Your No.:         **132248-5**

Date of Guarantee: **September 29, 2023**                      Fee:        **$570.00**

1.  Name of Assured:

    **Mortgage Lender Services, Inc. and National Loan Acquisitions Company**

2.  The estate or interest in the Land that is the subject of this Guarantee is:

    **Fee Simple**

3.  Assurances:

    According to the Public Records as of the Date of Guarantee,

    a.  Title to the estate or interest is vested in:

    **Philip H. Inman, an unmarried man**

    b.  Title to the estate or interest is subject to defects, liens or encumbrances shown in Schedule B which are not necessarily shown in the order of their priority.

    c.  The Land referred to in this Guarantee is situated in the State of California, County of Orange, and is described as follows:

    **See Exhibit "A" attached hereto and made a part hereof**

    d.  Relative to the Mortgage shown in Paragraph 10 of Schedule B:

        i.  For the purposes of California Civil Code §§ 2924b (b) and (d), the address of the trustor or mortgagor as shown in the Mortgage is:

        **Philip H. Inman
        2042 Palmetto Terrace
        Fullerton, CA 92831**

        ii.  The names and addresses of all persons who have recorded requests for a copy of notice of default and for a copy of notice of sale as provided by California Civil Code §§ 2924b (a), (b) and (d) are:

        **None**

        iii.  The names and addresses of all additional persons who are entitled to receive a copy of notice of default and a copy of notice of sale as provided by California Civil Code §§ 2924b (c) (1), (2) and (3) are:

        **American Surety Company
        P.O. Box 68932
        Indianapolis, IN 46268**

        **Affects: Item #11**

        iv.  The names and addresses of all associations defined in California Civil Code §§ 4080 or 6528 that have recorded a request for notice that are entitled to receive a copy of any trustee's deed upon sale as provided by California Civil Code § 2924b (f) are:

        **None**

        v.  The names and addresses of all state taxing agencies that are entitled to receive a copy of notice of sale as provided by California Civil Code § 2924b (c) (3) are:

        **None**

        vi.  The address of the Internal Revenue Service to which a copy of notice of sale is to be mailed as provided by California Civil Code § 2924b (c) (4) is:

        **Not Applicable**

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

vii.    The name of each city in which the Land is located is:

**Fullerton**

If not in a city, each public notice district in which the land is located is:

**Not Applicable**

viii.    The name of a newspaper of general circulation for the publication of a notice of sale as required by California Civil Code § 2924f (b) (1) is:

**Fullerton News Tribune**
**Published: Thursday**

## TRUSTEE'S SALE GUARANTEE

## SCHEDULE B

1.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2023-2024.

2.  General and Special City and/or County taxes, including any personal property taxes and any assessments collected with taxes, for the fiscal year 2022-2023:

    | | |
    |---|---|
    | 1st Installment: | $2,281.23, Paid |
    | 2nd Installment: | $2,281.23, Paid |
    | Parcel No.: | 285-311-15 |
    | Code Area: | 03-014 |

3.  Assessments, if any, for Community Facility Districts affecting said land which may exist by virtue of assessment map or notices filed by said districts. Said assessments are collected with the County Taxes.

4.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California.

5.  Said land disclosed herein is also known by the County Tax Assessor as the following parcel number(s):

    285-311-15

6.  Covenants, conditions, or restrictions, if any, appearing in the Public Records; but omitting, except to the extent permitted by any applicable federal or state law, covenants or restrictions, if any, based on race, color, religion, sex, familial status, national origin, handicap, sexual orientation, marital status, ancestry, source of income, disability, medical condition, or other unlawful basis.

7.  Any easements, servitudes, or senior encumbrances appearing in the Public Records.

8.  Any lease, grant, exception, or reservation of mineral rights appearing in the Public Records.

9.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

    | | |
    |---|---|
    | Amount: | $277,000.00 |
    | Dated: | July 19, 2005 |
    | Trustor: | Philip H. Inman, an unmarried man |
    | Trustee: | Full Service, Inc, a California Corporation |
    | Beneficiary: | Mortgage Electronic Registration Systems, Inc., solely as nominee for the Lender |
    | Lender: | Fullerton Community Bank, FSB |
    | Recorded: | July 26, 2005 |
    | Instrument No.: | 2005000576591, of Official Records |

    The beneficial interest under said Deed of Trust was:

    | | |
    |---|---|
    | Assigned to: | Bank of America, National Association, successor by merger to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP |
    | By: | Mortgage Electronic Registration Systems, Inc. |
    | By Assignment Recorded: | January 4, 2012 |
    | As Instrument No.: | 2012000002710, of Official Records |

    The beneficial interest under said Deed of Trust was:

    | | |
    |---|---|
    | Assigned to: | Federal National Mortgage Association |
    | By: | Bank of America, National Association, successor by merger to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP |
    | By Assignment Recorded: | March 31, 2015 |
    | As Instrument No.: | 2015000161817, of Official Records |

    A Substitution of Trustee which names The Mortgage Law Firm, PLC as trustee, recorded August 19, 2016, as Instrument No. 2016000393092, of Official Records.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

The beneficial interest under said Deed of Trust was:

| | |
|---|---|
| Assigned to: | MTGLQ Investors, L.P. |
| By: | Federal National Mortgage Association, by Nationwide Title Clearing, Inc., its Attorney-in-Fact |
| By Assignment Recorded: | July 21, 2017 |
| As Instrument No.: | 2017000300591, of Official Records |

The beneficial interest under said Deed of Trust was:

| | |
|---|---|
| Assigned to: | Wilmington Trust, National Association, not in its individual capacity but solely as Trustee of MFRA Trust 2015-1 |
| By: | MTGLQ Investors, L.P. |
| By Assignment Recorded: | April 9, 2018 |
| As Instrument No.: | 2018000124250, of Official Records |

A Substitution of Trustee which names Prestige Default Services as trustee, recorded April 4, 2019, as Instrument No. 2019000108050, of Official Records.

10. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $290,000.00 |
| Dated: | December 22, 2005 |
| Trustor: | Philip H. Inman, an unmarried man |
| Trustee: | Full Service, Inc |
| Lender: | Fullerton Community Bank, FSB |
| Recorded: | December 27, 2005 |
| Instrument No.: | 2005001029858, of Official Records |

The above deed of trust is an equity/credit line.

A Substitution of Trustee which names T.D. Service Company as trustee, recorded August 20, 2012, as Instrument No. 2012000477676, of Official Records.

A Substitution of Trustee which names First American Title Insurance Company as trustee, recorded September 5, 2017, as Instrument No. 2017000375865, of Official Records.

The beneficial interest under said Deed of Trust was:

| | |
|---|---|
| Assigned to: | National Loan Acquisitions Company, an Oregon Corporation |
| By: | Pacific Premier Bank, a California Commercial Bank, successor by merger to Fullerton Community Bank, FSB |
| By Assignment Recorded: | December 3, 2020 |
| As Instrument No.: | 2020000708894, of Official Records |

A Substitution of Trustee which names Mortgage Lender Services, Inc as trustee, recorded September 29, 2023, as Instrument No. 2023000239276, of Official Records.

A Notice of Default recorded September 29, 2023, as Instrument No. 2023000239277, of Official Records.

11. Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

| | |
|---|---|
| Amount: | $175,000.00 |
| Dated: | January 4, 2008 |
| Trustor: | Philip H. Inman |
| Trustee: | Underwriters Surety, Inc., an Indiana Corporation |
| Lender: | American Surety Company |
| Recorded: | January 10, 2008 |
| Instrument No.: | 2008000015165, of Official Records |

12. Any claim arising out of a bankruptcy proceeding that is not disclosed by notice pursuant to U.S.C. § 549 (c).

NOTE: If the property which is the subject of this report or guarantee has been used, is being used, or was acquired with the intent that it be used in connection with a marijuana related enterprise, including but not limited to the cultivation, storage, distribution, transport, manufacture or sale of marijuana and/or products containing marijuana, the federal government (or the state or local government if such use is deemed to be noncompliant with state or local law) may claim a preeminent right to the property automatically effective as of the date of the use which it deems illegal. Nothing in this report or guarantee provides assurances against the exercise of such a governmental forfeiture, regulatory or police power, and further, Company expressly reserves the right to decline to close or insure such a property following the completion of any litigation or foreclosure action conducted on said property. You are advised to consult your legal counsel on whether it is required, advisable, or inadvisable to give notice to the Federal and/or State government in order to address potential forfeiture issues.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

All that certain real property situated in the County of Orange, State of California, described as follows:

Lot 16 of Tract No. 14935, in the City of Fullerton, County of Orange, State of California, as per Map recorded in Book 718, Pages 40 to 50 inclusive of Miscellaneous Maps, and by Certificate of Correction recorded March 27, 1995 as Instrument No. 95-0119503, of Official Records, in the Office of the County Recorder of said County.

NOTE:   For information purposes only, for which the Company assumes no liability for any inaccuracies or omissions, the purported street address of said land as determined from the latest County Assessor's Roll is:

2042 PALMETTO TERRACE, Fullerton, CA  92831

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3



**WFG NATIONAL TITLE INSURANCE COMPANY**

## EXCLUSIONS FROM COVERAGE

1.  Except to the extent of the assurances set forth in Paragraph 3 of Schedule A, the Company assumes no liability for loss or damage by reason of any law, ordinance, governmental regulation or any other police power adopted or promulgated by any federal or state government authority purporting to regulate non-judicial foreclosures or any related duties, whether or not disclosed by the Public Records at the Date of Guarantee.

2.  Notwithstanding any assurances set forth in Paragraph 3 of Schedule A, the Company assumes no liability for loss or damage by reason of the following:

(a)  Defects, liens, encumbrances, adverse claims or other matters affecting the title to any property beyond the lines of the Land expressly described in the description set forth in Schedule A of this Guarantee, or title to streets, roads, avenues, lanes, ways or waterways to which such Land abuts, or the right to maintain therein vaults, tunnels, ramps or any structure or improvements; or any rights or easements therein, unless such property, rights or easements are expressly and specifically set forth in said description.

(b)  Defects, liens, encumbrances, adverse claims or other matters, whether or not shown by the Public Records (1) that are created, suffered, assumed or agreed to by one or more of the Assureds; (2) that result in no loss to the Assured; or (3) that do not result either in the invalidity of any non-judicial proceeding to foreclose the lien of the Mortgage or the failure of any such non-judicial foreclosure proceeding to divest a lien, estate or interest subordinate or subject to the lien of the Mortgage.

(c)  Defects, liens, encumbrances, adverse claims or other matters against the title, not shown by the Public Records.

(d)  The identity of any party shown or referred to in Schedule A.

(e)  The validity, legal effect or priority of any matter shown or referred to in this Guarantee.

(f)  Any law, ordinance, governmental regulation or any other police power adopted or promulgated by any county, city, or any other local government authority purporting to regulate non-judicial foreclosures or any related duties, whether or not disclosed by the Public Records at the Date of Guarantee.

(g)  (1) Taxes or assessments of any taxing authority that levies taxes or assessments on real property; or, (2) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not the matters excluded under (1) or (2) are shown by the records of the taxing authority or by the Public Records.

(h)  (1) Unpatented mining claims; (2) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (3) water rights, claims or title to water, whether or not the matters excluded under (1), (2) or (3) are shown by the Public Records.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

## WFG NATIONAL TITLE INSURANCE COMPANY

### INFORMATIONAL NOTES

No assurances as set forth in Paragraph 3 of Schedule A are provided in connection with the following information and the Company assumes no liability for any inaccuracies in or omissions from the information. This information is not intended to be comprehensive and does not necessarily include all laws and regulations that might affect the contemplated foreclosure.

1. Attention is called to Article I commencing with California Civil Code Sections 2920 et. seq, of Chapter 2, Title 14, Part 4, Division 3, that govern the actions of mortgagees, beneficiaries, mortgage servicers, trustees, and their agents with respect to non-judicial foreclosures.

2. Attention is called to the Servicemembers Civil Relief Act (SCRA) (*50 USC §§3901 et seq.*), the Military Reservist Relief Act of 1991 (*California Military and Veterans Code §§ 800 et seq.*), and Military and Veterans Code § 408, that contain restrictions against the sale of land under a deed of trust or mortgage if the owner is entitled to the benefits of those laws.

3. Attention is called to the Federal Tax Lien Act of 1966 (26 USC §§ 6321 et seq.), that, among other things, provides for the giving of written notice of sale in a specified manner to the Secretary of Treasury or his or her delegate as a requirement for the discharge or divestment of a Federal Tax Lien in a non-judicial sale, and establishes with respect to that lien a right in the United States to redeem the property within a period of 120 days from the date of the sale.

4. Attention is called to California Government Code § 16187, that, among other things, provides for the giving of written notice of sale in a specified manner to the Controller of the State of California necessary for the discharge or divestment in a non-judicial sale of a Notice of Lien for Postponed Property Taxes recorded in the public records subsequent to the recording of a notice of default.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

### TRUSTEE'S SALE GUARANTEE CONDITIONS

**1.  Definition of Terms.**

The following terms when used in the Guarantee mean:

(a) the "Assured": (i) the party or parties named as the Assured in Schedule A, or on a supplemental writing executed by the Company, (ii) the duly substituted trustee of the Mortgage and (iii) the owner of the indebtedness or other obligation secured by the Mortgage.

(b) "Land":  the Land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property.   The term "Land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways.

(c) "Mortgage": the mortgage, deed of trust, trust deed, or other security instrument set forth in  Paragraph 3.d. of Schedule A.

(d) "Public Records":  those records established under California statutes at Date of Guarantee for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge.

(e) "Date of Guarantee":  the Date of Guarantee set forth in Schedule A

**2.  Notice of Claim to be Given by Assured.**

The Assured shall notify the Company promptly in writing in case knowledge shall come to the Assured of any assertion of facts, or claims of title or interest that are contrary to the assurances set forth in Paragraph 3 of Schedule A and that might cause loss or damage for which the Company may be liable under this Guarantee. If prompt notice shall not be given to the Company, then all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of the Assured under this Guarantee unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

**3.  No Duty to Defend or Prosecute.**

The Company shall have no duty to defend or prosecute any action or proceeding to which the Assured is a party, notwithstanding the nature of any allegation in such action or proceeding.

**4.  Company's Option to Defend or Prosecute Actions; Duty of Assured to Cooperate.**

Even though the Company has no duty to defend or prosecute as set forth in Paragraph 3 above:

(a) The Company shall have the right, at its sole option and cost, to institute and prosecute any action or proceeding, interpose a defense, as limited in Paragraph 4.b. or to do any other act which in its opinion may be necessary or desirable to establish the correctness of the assurances set forth in Paragraph 3 of Schedule A or to prevent or reduce loss or damage to the Assured including, but not limited to, repeating the trustee's sale proceeding.  The Company may take any appropriate action under the terms of this Guarantee, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this Guarantee.  If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(b) If the Company elects to exercise its options as stated in Paragraph 4.a. the Company shall have the right to select counsel of its choice (subject to the right of the Assured to object for reasonable cause) to represent the Assured and shall not be liable for and will not pay the fees of any other counsel, nor will the Company pay any fees, costs or expenses incurred by the Assured in the defense of those causes of action which allege matters not covered by this Guarantee.

(c) Whenever the Company shall have brought an action or interposed a defense as permitted by the provisions of this Guarantee, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from an adverse judgment or order.

(d) In all cases where this Guarantee permits the Company to prosecute or provide for the defense of any action or proceeding, the Assured shall secure to the Company the right to so prosecute or provide for the defense of any action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the Assured for this purpose.  Whenever requested by the Company, the Assured, at the Company's expense, shall give the Company all reasonable aid in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or lawful act which in the opinion of the Company may be necessary or desirable to establish the correctness of the assurances set forth in Paragraph 3 of Schedule A.  If the Company is prejudiced by the failure of the Assured to furnish the required cooperation, the Company's obligations to the Assured under the Guarantee shall terminate.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

**5.  Proof of Loss or Damage.**

(a)  In addition to and after the notices required under Section 2 of these Conditions have been provided to the Company, a proof of loss or damage signed and sworn to by the Assured shall be furnished to the Company within ninety (90) days after the Assured shall ascertain the facts giving rise to the loss or damage.  The proof of loss or damage shall describe the matters covered by this Guarantee which constitute the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.  If the Company is prejudiced by the failure of the Assured to provide the required proof of loss or damage, the Company's obligation to the Assured under the Guarantee shall terminate.

(b)  The Company may reasonably require the Assured  to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Guarantee, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Assured shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Assured provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Assured  to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this Guarantee as to that claim.

**6.  Options to Pay or Otherwise Settle Claims:  Termination of Liability.**

In case of a claim under this Guarantee, the Company shall have the following additional options:

(a)  To Pay or Tender Payment of the Amount of Guarantee or to Purchase the Indebtedness.

   i.  To pay or tender payment of the full amount of this Guarantee together with any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

   ii.  To purchase the indebtedness secured by the Mortgage for the amount owing thereon, together with any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company so purchases such indebtedness, the owner thereof shall transfer, assign, and convey to the Company the indebtedness and the Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in Paragraphs 6.a.i. or 6.a.ii., all liability and obligations of the Company to the Assured under this Guarantee, other than to make the payment required in those paragraphs, shall terminate, including any duty to continue any and all litigation initiated by Company pursuant to Paragraph 4.

(b)  To Pay or Otherwise Settle With Parties Other Than the Assured or With the Assured.

   i.  To pay or otherwise settle with other parties for or in the name of an Assured  any claim assured against under this Guarantee. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

   ii.  To pay or otherwise settle with the Assured  the loss or damage provided for under this Guarantee, together with any costs, attorneys' fees, and expenses incurred by the Assured  that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in Paragraphs 6. b.i. or  6.b.ii., the Company's obligations to the Assured under this Guarantee for the claimed loss or damage, other than the payments required to be made, shall terminate, including any duty to continue any and all litigation initiated by Company pursuant to Paragraph 4.

**7. Limitation of Liability.**

This Guarantee is a contract of Indemnity against actual monetary loss or damage sustained or incurred by the Assured who has suffered loss or damage by reason of reliance upon the assurances set forth in Paragraph 3 of Schedule A and only to the extent herein described, and subject to the Exclusions From Coverage and Conditions of this Guarantee.

(a) The liability of the Company under this Guarantee to the Assured shall not exceed the least of:

    i. the amount of liability stated in Schedule A;

    ii. the amount of the unpaid principal indebtedness secured by the Mortgage as limited or as reduced under Paragraph 8 of these Conditions at the time the loss or damage assured against by this Guarantee occurs, together with interest thereon; or

    iii. the difference between the value of the estate or interest set forth in Schedule A and the value of the estate or interest subject to any defect, lien, encumbrance or other matter assured against by this Guarantee..

(b) If the Company or the Assured under the direction of the Company at the Company's expense establishes the title, or removes the alleged defect, lien or, encumbrance or cures any other matter assured against by this Guarantee in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(c) In the event of any litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom.

(d) The Company shall not be liable for loss or damage to the Assured for liability voluntarily assumed by the Assured in settling any claim or suit without the prior written consent of the Company.

**8. Reduction of Liability or Termination of Liability.**

All payments under this Guarantee, except payments made for costs, attorneys' fees and expenses pursuant to Paragraph 4 shall reduce the amount of liability pro tanto.

**9. Payment of Loss.**

(a) No payment shall be made without producing this Guarantee for endorsement of the payment unless the Guarantee has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions the loss or damage shall be payable within thirty (30) days thereafter.

**10. Subrogation Upon Payment or Settlement.**

Whenever the Company shall have settled and paid a claim under this Guarantee, all right of subrogation shall vest in the Company unaffected by any act of the Assured.

The Company shall be subrogated to and be entitled to all rights and remedies which the Assured would have had against any person or property in respect to the claim had this Guarantee not been issued. If requested by the Company, the Assured shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Assured shall permit the Company to sue, compromise or settle in the name of the Assured and to use the name of the Assured in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Assured the Company shall be subrogated to all rights and remedies of the Assured after the Assured shall have recovered its principal, interest, and costs of collection.

**11. Arbitration.**

Either the Company or the Assured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Assured arising out of or relating to this Guarantee, any service in connection with its issuance or the breach of a Guarantee provision, or to any other controversy or claim arising out of the transaction giving rise to this Guarantee. All arbitrable matters when the amount of liability in Schedule A is $2,000,000 or less shall be arbitrated at the option of either the Company or the Assured. All arbitrable matters when the amount of liability in Schedule A is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Assured. Arbitration pursuant to this Guarantee and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

12. **Liability Limited to This Guarantee; Guarantee Entire Contract.**

    (a) This Guarantee together with all endorsements, if any, attached hereto by the Company is the entire Guarantee and contract between the Assured and the Company.  In interpreting any provision of this Guarantee, this Guarantee shall be construed as a whole.

    (b) Any claim of loss or damage, whether or not based on negligence, or any action asserting such claim, shall be restricted to this Guarantee.

    (c) No amendment of or endorsement to this Guarantee can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

13. **Notices, Where Sent.**

    All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this Guarantee and shall be addressed to the Company at 12909 SW 68th Parkway, Suite 350, Portland, OR 97223.  WFG National Title Insurance Company's telephone number is (800) 334-8885.

WFG Form No. 3174406
CLTA Guarantee Form No. 22 (06-05-14) – Trustee's Sale Guarantee
Revised 1-07-2017

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

**Williston Financial Group Privacy Notice**

Williston Financial Group LLC, WFG National Title Insurance Company, and each of the affiliates listed below (collectively "WFG" or the "WFG Family") believe it is important to protect your privacy and confidences. We recognize and respect the privacy expectations of our customers. We believe that making you aware of how we collect information about you, how we use that information, and with whom we share that information will form the basis for a relationship of trust between us. This Privacy Notice provides that explanation. We reserve the right to change this Privacy Notice from time to time.

WFG's primary business is providing appraisal, title insurance, and escrow services for the sale or refinance of real property. This can be a complicated process involving multiple parties, many of whom have been selected by our customers, each filling a specialized role. In part, you have hired WFG to coordinate and smooth the passage of the information necessary for an efficient settlement or closing.

In the course of this process, WFG collects a significant amount of personal and identifying information about the parties to a transaction, including sensitive items that include but are not limited to: your contact information, including email addresses, Social Security numbers, driver's license, and other identification numbers and information; financial, bank and insurance information; information about past and proposed mortgages and loans; information about properties you currently or previously owned; your mortgage application package; and the cookie, IP address, and other information captured automatically by computer systems.

Much of this information is gathered from searches of public land, tax, court and credit records to make certain that any liens, challenges or title defects are addressed properly. Some of the information that is collected is provided by you or the computer systems you use. We also may receive information from real estate brokers and agents, mortgage brokers and lenders, and others working to facilitate your transaction, as well as information from public, private or governmental databases including credit bureaus, 'no-fly' lists, and terrorist 'watch lists'.

**What Information is Shared?**

**WFG DOES NOT SELL any of your information to non-affiliated companies for marketing or any other purpose.**

However, some of the same information does get shared with persons inside and outside the WFG Family in order to facilitate and complete your transaction.

For example:

However, some of the same information does get shared with persons inside and outside the WFG Family in order to facilitate and complete current and future transactions.

For example:

- Information, draft documents, and closing costs will pass back and forth between WFG and your mortgage broker and lender to facilitate your transaction.
- Information, including purchase agreements and amendments, will pass back and forth between WFG and the real estate agents and brokers, the mortgage brokers and lenders, the lawyers and accountants, and others involved in facilitating the transaction.
- WFG may order property searches and examinations from title searchers, abstractors and title plants.
- WFG may use third parties to obtain tax information, lien information, payoff information, and condominium or homeowners' association information.
- Third parties may be engaged to prepare documents in connection with your transaction.
- Surveys, appraisals, and inspections may be ordered.
- Within the WFG Family of companies, we may divide up the work to handle each closing in the most efficient manner possible and to meet specific legal and licensing requirements. Certain parts of your closing (for example a search or disbursement) may be handled by another division or company within the WFG Family.

WFG Privacy Policy

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

- When it is time for signatures, your complete closing package may be sent to a notary, remote online notary, or notary service company who will arrange to meet with you to sign documents. The notary will, in turn, send signed copies back to us along with copies of your driver's license or other identity documents, usually by mail, UPS, Federal Express or another courier service.
- Your deed, mortgage and other documents required to perfect title will be recorded with the local recorder of deeds.
- In some cases, we use an outside service to coordinate the recording or electronic-recording of those instruments, and they will receive copies of your deeds, mortgages and other recordable documents to process, scan and send on to the recording office.
- Information within your title policy may be shared with WFG National Title Insurance Company title policy issuing agents to facilitate future financial transactions involving your property.
- Various government agencies get involved. The law requires us to provide certain information to the IRS, the U.S. Department of the Treasury, local and state tax authorities, and other regulatory and governmental agencies.
- **WFG title policy issuing agents only**: personal information provided by you may be shared with a third party for the purposes of facilitating training to obtain CE/CLE credits.

You have a choice in the selection of a mortgage broker, lender, real estate broker or agent and others that make up your 'transaction team.' Information flows to and from the members of the transaction team you have selected to facilitate an efficient transaction for you.

When WFG selects and engages a third party provider, we limit the scope of the information shared with that third party to the information reasonably necessary for that service provider to provide the requested services. With most, we have entered into agreements in which they expressly commit to maintain a WFG customer's information in strict confidence and use the information only for purposes of providing the requested services, clearing title, preventing fraud and addressing claims under our title insurance policies.

### How does WFG use your Information?

We may use your personal information in a variety of ways, including but not limited to:

- Provide the products, services and title insurance you have requested, and to close and facilitate your transaction.
- Provide and use historic transaction information to facilitate future financial transactions.
- Coordinate and manage the appraisal process.
- Handle a claim or provide other services relating to your title insurance policies.
- Create, manage, and maintain your account.
- Operate and improve WFG's applications and websites, including WFG MyHome®, WFG's secure communication and transaction portal. Your information is used for access management, payment processing, site administration, internal operations, troubleshooting, data analysis, testing, research, and for statistical purposes.
- Respond to your requests, feedback or inquiries.
- Comply with laws, regulations, and other legal requirements.
- Comply with relevant industry standards and our policies, including managing WFG's risk profile through reinsurance.
- Protect and enforce your rights and the rights of other users against unlawful activity, including identity theft and fraud.
- Protect and enforce our collective rights arising under any agreements entered into between WFG and you or any other third party.
- Protect the integrity and maintain security of our applications, websites, and products.
- Operate, evaluate, and improve our business.
- Provide you with information about products, services, and promotions from WFG or third parties that may interest you.
- **WFG title policy issuing agents only**: Provide you with a training platform to obtain CE/CLE credits

WFG Privacy Policy

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

## How Do We Store and Protect Your Personal Information?

Although no system can guarantee the complete security of your personal information, we will use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your personal information and our systems and sites from malicious intrusions or hacking.

## How Long Do We Keep Your Personal Information?

We keep your personal information for as long as necessary to comply with the purpose for which it was collected, our business needs, and our legal and regulatory obligations. We may store some personal information indefinitely. If we dispose of your personal information, we will do so in a way that is secure and appropriate to the nature of the information subject to disposal.

## Computer Information

When you access a WFG website, or communicate with us by e-mail, we may automatically collect and store more information than you are expressly providing when you fill out a survey or send an email.   This may include:

- Your IP Address.
- Your email address, your alias and, social media handles.
- The type of browser and operating system you use.
- The time of your visit.
- The pages of our site you visit.
- Cookies.

In order to provide you with customized service, we make use of Web browser cookies. Cookies are files that help us identify your computer and personalize your online experience. You may disable cookies on your computer, but you may not be able to download online documents or access certain websites unless cookies are enabled.

The technical information we collect is used for administrative and technical purposes and to prevent fraud and provide identity verification. For instance, we may use it to count the number of visitors to our website and determine the most popular pages. We may also use it to review types of technology you are using, determine which link brought you to our website, assess how our advertisements on other websites are working, help with maintenance, and improve our customers' experience.

We may compare information gathered on previous visits to verify that we are interacting with the same parties and not a potential imposter.

If we ask you to fill out any forms or surveys, we will use the information we receive only for the specific purposes indicated in those forms or surveys.

The information you and your transaction team send us in emails or attached to an email, or provide through any of our online tools, is used for purposes of providing title, escrow and appraisal management services and used for the purposes described above.

In addition to the above, if you use an eClosing platform to sign your real estate transaction additional information may be collected. This may include:

- Your IP address.
- Your location.
- Your email address and your alias.
- The type of browser and operating system you use.
- The time of your visit.
- Your biometrics.
- Your image.
- Video recording of your transaction signing.
- Transaction metadata.
- Cookies.

## Links to Third Party Sites

Our Applications and Websites may contain links to third-party websites and services. Please note that these links are provided for your convenience and information, and the websites and services may operate independently from us and have their own privacy policies or notices, which we strongly suggest you review. This Privacy Notice applies to WFG's applications and websites only.

WFG Privacy Policy

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

## Do Not Track

Because there is not an industry-standard process or defined criteria to permit a user to opt-out of tracking their online activities ("Do Not Track"), our websites do not currently change the way they operate based upon detection of a Do Not Track or similar signal. Likewise, we cannot assure that third parties are not able to collect information about your online activities on WFG websites or applications.

## Social Media Integration

Our applications, websites, and products contain links to and from social media platforms. You may choose to connect to us through a social media platform, such as Facebook, Twitter, Google, etc. When you do, we may collect from the social media platform additional information from or about you, such as your screen names, profile picture, contact information, contact list, and the profile pictures of your contacts. The social media platforms may also collect information from you.

When you click on a social plug-in, such as Facebook's "Like" button, Twitter's "tweet" button, or the Google+, that particular social network's plug-in will be activated and your browser will directly connect to that provider's servers. Your action in clicking on the social plug-in causes information to be passed to the social media platform.

We do not have control over the collection, use and sharing practices of social media platforms. We therefore encourage you to review their usage and disclosure policies and practices, including their data security practices, before using social media platforms.

## How Can You "Opt-Out?"

We do not sell your information; therefore there is no need to opt-out of such reselling.  Under various laws, you can opt-out of the sharing of your information for more narrow purposes.  For additional detail, consult the Links under the "Legal" Notices attached below.

## The "Legal" Notices

To comply with various federal and state laws, we are required to provide more complete legal notices and disclosures – see links below. The state-specific statutes referenced therein may also give residents of those states additional rights and remedies.

**Privacy Notice for California Residents** - https://national.wfgnationaltitle.com/privacy-notice-california

**Privacy Notice for Oregon Residents** - https://national.wfgnationaltitle.com/privacy-notice-oregon

### How to Contact Us

If you have any questions about WFG's privacy notice or how we protect your information, please contact WFG:

- By email: Consumerprivacy@willistonfinancial.com
- By telephone: 833-451-5718
- By fax: 503-974-9596
- By mail: 12909 SW 68th Pkwy, Suite 350, Portland, OR 97223

### WFG FAMILY
WILLISTON FINANCIAL GROUP LLC
WFG NATIONAL TITLE INSURANCE COMPANY
WFG LENDER SERVICES, LLC
WFGLS TITLE AGENCY OF UTAH, LLC
WFG NATIONAL TITLE COMPANY OF WASHINGTON, LLC
WFG NATIONAL TITLE COMPANY OF CALIFORNIA
WFG NATIONAL TITLE COMPANY OF TEXAS, LLC D/B/A WFG NATIONAL TITLE COMPANY
UNIVERSAL TITLE PARTNERS, LLC
VALUTRUST SOLUTIONS, LLC
MYHOME, A WILLISTON FINANCIAL GROUP COMPANY, LLC (formerly known as WILLISTON ENTERPRISE SOLUTIONS & TECHNOLOGY, LLC)
WFG NATIONAL TITLE COMPANY OF CLARK COUNTY, WA, LLC, D/B/A WFG NATIONAL TITLE

Rev 12.20.2022

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

Rev. 12/2022

| FACTS | WHAT DOES WILLISTON FINANCIAL GROUP DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and other government identification information<br>• Your name, address, phone, and email<br>• Information about the property, any liens and restrictions<br>• Financial Information including credit history and other debt<br>• Financial account information, including wire transfer instructions. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Williston Financial Group chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Williston Financial Group share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes— such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes— to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes— information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes— information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For nonaffiliates to market to you | No | We don't share |

| To limit our sharing | • Call 833-451-5718—our menu will prompt you through your choice(s)<br>• Visit us online: http://bit.ly/WFGsConsumerPrivacyInformationRequestPage or e-mailing us at consumerprivacy@willistonfinancial.com<br>• Mail the form below<br><br>Please note:<br><br>If you are a new customer, we can begin sharing your information from the date we sent this notice. When you are no longer our customer, we continue to share your information as described in this notice.<br>However, you can contact us at any time to limit our sharing. |
|---|---|
| Questions? | Call 833-451-5718 or Email consumerprivacy@willistonfinancial.com |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Mail-In Form | |
|---|---|
| If you have a joint policy, your choices will apply to everyone on your account. | Mark any/all you want to limit:<br>[ ] Do not share information about my creditworthiness with your affiliates for their everyday business purposes.<br>[ ] Do not allow your affiliates to use my personal information to market to me.<br>[ ] Do not share my personal information with nonaffiliates to market their products and services to me. |

| Name | | Mail to: |
|---|---|---|
| Address | | Williston Financial Group |
| City, State, Zip | | PRIVACY DEPT |
| File Number | | 12909 SW 68th Pkwy, #350 |
| | | Portland, OR 97223 |

Page 2

| **Who we are** | |
|---|---|
| Who is providing this notice | Williston Financial Group, LLC and its affiliates and subsidiaries as listed below: |

| **What we do** | |
|---|---|
| How does Williston Financial Group protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings.  We limit access to your information to employees that need to use the information to process or protect transaction. We take industry standard (IPSEC) measures to protect against malicious intrusions or hacking |
| How does Williston Financial Group collect my personal information? | We collect your personal information, for example, when you<br>• Apply for insurance<br>• Engage us to provide appraisal, title and escrow services<br>• Give us your contact information<br>• Provide your mortgage information<br>• Show your driver's license<br><br>We also collect your personal information from others, such as real estate agents and brokers, mortgage brokers, lenders, credit bureaus, affiliates, and others |
| Why can't I limit all sharing? | Federal law gives you the right to limit only<br>• sharing for affiliates' everyday business purposes— information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices will apply to everyone on your policy. |

| **Definitions** | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Our affiliates include companies with a common corporate identity, including those listed below. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>Nonaffiliates we share with can include real estate agents and brokers, mortgage brokers, lenders, appraisers, abstractors and title searchers and others as appropriate to facilitate your transaction. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>Williston Financial Group does not jointly market. |

| **Other important information** |
|---|
| As a resident or citizen of certain states, we may have to provide additional state specific privacy notices and you may have rights other than as set forth above.  The links below will provide state specific information:<br><br>**Privacy Notice for California Residents** - https://national.wfgnationaltitle.com/privacy-notice-california<br>**Privacy Notice for Oregon Residents** - https://national.wfgnationaltitle.com/privacy-notice-oregon |

WFG Privacy Policy

DECLARATION OF COLIN THOMPSON
EXHIBIT 3

## DECLARATION OF SCOTT A. SCHIFF

I, Scott A. Schiff, declare and say as follows:

1.      I am an attorney at law licensed to practice before the courts of the State of California and before this Court.  I am a partner of Soukup & Schiff, LLP, counsel to National Loan Acquisitions Company ("NLAC").  I make the following declaration on the basis of my own firsthand knowledge, except for those matters which are stated upon information and belief which I believe to be true, and if called upon to do so, could and would competently testify thereto.  I make this declaration in support of NLAC's Objections to Debtor Philip H. Inman's Original Chapter 13 Plan (the "Objections").

2.      On March 5, 2024, I attended Debtor Philip H. Inman's Meeting of Creditors via Zoom.  Debtor stated during his Meeting of Creditors that the monthly payment to Planet Home Lending is $1,480.00.

3.      Debtor stated during his Meeting of Creditors that PKN Investments, LLC ("PKN") is owed approximately $220,000.00, that the payment on that loan is $1,837.50 a month, and that loan is secured by his 50% interest in the property located at 12066-68 Downey Avenue, Downey, California 90241 (the "Downey Property").

4.      I am informed and believe that there are two Deeds of Trust recorded against Debtor's 50% interest in the Downey Property, and that both of those Deeds of Trust are in favor of PKN. Attached hereto as Exhibit 1 is a true and correct copy of the Data Tree report regarding the Downey Property that I obtained on March 13, 2024 reflecting Los Angeles County Data as of March 8, 2024 (the "Data Tree Report").  The Data Tree Report shows, on page 3, that there are two active Deeds of Trust in favor of PKN.  The first position Deed of Trust, recorded on January 10, 2018, secures a loan in the original amount of $90,000.00, and the second position Deed of Trust, recorded on September 26, 2019, secures a loan in the original amount of $210,000.00.  A copy of the Deed of Trust recorded

1   on September 26, 2019 is included within the Data Tree Report. A true and copy of the Deed of

2   Trust recorded on January 10, 2018, is attached hereto as Exhibit 2.

3      I declare under penalty of perjury under the law of the United States of America that the

4   foregoing is true and correct.

5      Executed this 14th day of March, 2024 at Encino, California.

6

7

8                         Scott A. Schiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Property Detail Report

## 12066 Downey Ave, Downey, CA 90242-2532
APN: 6258-007-041

Reference ID: NTLINM
Los Angeles County Data as of: 03/08/2024

### Owner Information

| | | | |
|---|---|---|---|
| Owner Name: | Inman Philip H / J C & E A Van Zee Trust & / Van Zee Elizabeth A TR | | |
| Vesting: | Unmarried Man | | |
| Mailing Address: | Po Box 35413, Phoenix, AZ 85069-5413 | Occupancy: | Unknown |

### Location Information

| | | | |
|---|---|---|---|
| Legal Description: | Rancho Santa Gertrudes Finally Confirmed To J P Mcfarland And J G Downey Lot On Se Line Of Downey Ave Per Or25895-177 Com Sw Thereon 197.95 Ft From Sw Line Of Downey Villa Tr # 2 Th Sw On Sd Se Line 329.9 Ft S 62 43 E | County: | Los Angeles, CA |
| APN: | 6258-007-041 | Alternate APN: | |
| Munic / Twnshp: | South /Holy/Down/Bel G | Census Tract / Block: | 551202 / 4002 |
| Subdivision: | Rancho Santa Gertrudes | Twnshp-Rng-Sec: | |
| Neighborhood: | The Southeast | Tract #: | 2 | Legal Lot / Block: | |
| Elementary School: | Alameda Elementary... | School District: | Downey Unified School District | Legal Book / Page: | 13 / 18 |
| Latitude: | 33.92916 | Middle School: | Sussman Middle Sch... | High School: | Downey High School |
| | | Longitude: | -118.14009 | | |

### Last Transfer / Conveyance - Current Owner

| | | | |
|---|---|---|---|
| Transfer / Rec Date: | 12/01/2010 / 01/20/2011 | Price: | | Transfer Doc #: | 2011.109985 |
| Buyer Name: | Vanzee J C & E A Living Trust | Seller Name: | Vanzee Elizabeth A | Deed Type: | Quitclaim |

### Last Market Sale

| | | | |
|---|---|---|---|
| Sale / Rec Date: | / 12/12/1975 | Sale Price / Type: | $35,136 / | Deed Type: | Deed |
| Multi / Split Sale: | | Price / Sq. Ft.: | $6 | New Construction: | N/A |
| 1st Mtg Amt / Type: | | 1st Mtg Rate / Type: | | 1st Mtg Doc #: | |
| 2nd Mtg Amt / Type: | | 2nd Mtg Rate / Type: | | Sale Doc #: | 1975.12.12.947 |
| Seller Name: | Owner Name Unavailable | | | | |
| Lender: | | | | Title Company: | |

### Prior Sale Information

| | | | |
|---|---|---|---|
| Sale / Rec Date: | | Sale Price / Type: | | Prior Deed Type: | |
| 1st Mtg Amt / Type: | | 1st Mtg Rate / Type: | | Prior Sale Doc #: | N/A |
| Prior Lender: | | | | | |

### Property Characteristics

| | | | |
|---|---|---|---|
| Gross Living Area: | 6,358 Sq. Ft. | Total Rooms: | 0 | Year Built / Eff: | 1961 |
| Living Area: | 6,358 Sq. Ft. | Bedrooms: | 13 | Stories: | |
| Total Adj. Area: | | Baths (F / H): | 8 / | Parking Type: | |
| Above Grade: | 6,358 Sq. Ft. | Pool: | | Garage #: | |
| Basement Area: | | Fireplace: | | Garage Area: | |
| Style: | | Cooling: | | Porch Type: | |
| Foundation: | | Heating: | Heated | Patio Type: | |
| Quality: | Good | Exterior Wall: | | Roof Type: | |
| Condition: | | Construction Type: | Wood | Roof Material: | |

### Site Information

| | | | |
|---|---|---|---|
| Land Use: | Apartment | Lot Area: | 22,016 Sq. Ft. | Zoning: | DOR3-P* |
| State Use: | | Lot Width / Depth: | 66 / 330 | # of Buildings: | 3 |
| County Use: | 0500 - Five Or More Units Or Apartments (Any Combination) | Usable Lot: | 22016 | Res / Comm Units: | 8 / |
| Site Influence: | | Acres: | 0.505 | Water / Sewer Type: | |
| Flood Zone Code: | X | Flood Map #: | 06037C1820F | Flood Map Date: | 09/26/2008 |
| Community Name: | City Of Downey | Flood Panel #: | 1820F | Inside SFHA: | False |

### Tax Information

| | | | |
|---|---|---|---|
| Assessed Year: | 2023 | Assessed Value: | $256,058 | Market Total Value: | |
| Tax Year: | 2023 | Land Value: | $168,632 | Market Land Value: | |
| Tax Area: | 03-266 | Improvement Value: | $87,426 | Market Imprv Value: | |
| Property Tax: | $5,665.87 | Improved %: | 34.14% | Market Imprv %: | |



© 2024 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF

PAGE 1 OF 2

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

Exemption:                          Delinquent Year:



© 2024 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF        PAGE 2 OF 2

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

# Transaction History Report

## 12066 Downey Ave, Downey, CA 90242-2532
APN: 6258-007-041

Reference ID: NTLINM
Los Angeles County Data as of: 03/08/2024

### Current Owner: Vanzee J C & E A Living Trust
Vesting: Unmarried Man
1975 - Present

### LIENS

| Date | Type | Verified | Amount | Borrower(s) | Lender | Loan Type | Type / Term | Rate | Document # |
|------|------|----------|--------|-------------|--------|-----------|-------------|------|------------|
| 09/26/2019 | Trust Deed/Mortgage | | $210,000 | Inman Philip H | Pkn Investments LLC | | Est / | 3.60 0 | 2019.1007816 |
| 01/10/2018 | Trust Deed/Mortgage | | $90,000 | Lnman Philip H | Pkn Investments LLC | Construction | / 3 Years | | 2018.27939 |
| 02/28/1996 | Trust Deed/Mortgage | | $175,000 | Inman Trust | American Savings Bank | Conventional | Var / | | 1996.318620 |
| ⌃ 12/14/2011 | Release | | | | | | | | 2011.1688674 |

### CONVEYANCES

| Date | Rec Date | Verified | Price | Type | Title Company | Buyer | Seller | Document # |
|------|----------|----------|-------|------|---------------|-------|--------|------------|
| 12/01/2010 | 01/20/2011 | | | | | Vanzee J C & E A Living Trust | Vanzee Elizabeth A | 2011.109985 |
| 10/27/2009 | 11/04/2009 | | | | Attorney Only | Inman Philip H | Inman Alcie L Living Trust | 2009.1663119 |
| 04/30/1993 | 05/07/1993 | | | | | Inman Alcie L | | 1993.874180 |
| | 12/12/1975 | | $35,136 | | | Owner Name Unavailable | Owner Name Unavailable | 1975.12.12.947 |



DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

**Disclaimer:** This report: (i) is not an insured product or service or an abstract, legal opinion or a representation of the condition of title to real property, and (ii) is issued exclusively for the benefit of First American Data Tree LLC (Data Tree) customers and may not be used or relied upon by any other person. Estimated property values are: (i) based on available data; (ii) are not guaranteed or warranted; (iii) do not constitute an appraisal; and (iv) should not be relied upon in lieu of an appraisal. Data Tree does not represent or warrant that the information is complete or free from error, and expressly disclaims any liability to any person or entity for loss or damage caused by errors or omissions in the report. If the "verified" logo () is displayed, or a record is designated "verified," Data Tree's algorithm matched fields from two or more data sources to confirm source data.

School information is copyrighted and provided by GreatSchools.org.

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1



▲ This page is part of your document - **DO NOT DISCARD** ▲



## 20110109985



**Pages:**
0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**01/20/11 AT 11:47AM**

| | |
|---|---|
| FEES: | 32.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 32.00 |



**L E A D S H E E T**



201101200020087

**00003627889**



003111598

**SEQ:
05**

**DAR - Mail (Hard Copy)**



**THIS FORM IS NOT TO BE DUPLICATED**

E499011

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

WHEN RECORDED MAIL TO:

Elizabeth Van Zee
P. O. Box 35413
Phoenix, AZ 85069-5413



01/20/2011

*20110109985*

2

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## TRUST TRANSFER DEED

**(Excluded from Reappraisal Under Proposition 13, i.e., California Constitution, Article 13A§1 et seq.)**
**The undersigned Grantor(s) declare(s) under penalty of perjury that the following is true and correct:**
**THERE IS NO CONSIDERATION FOR THIS TRANSFER.**

There is no Documentary Transfer tax due.  This conveyance is a transfer to grantors' revocable
living trust R&T 11911, R&T 11925 (b).

**GRANTOR:** Elizabeth Ann Van Zee, a married woman, who acquired title as her sole and separate
property,

**hereby GRANT to**: James Charles Van Zee and Elizabeth Ann Van Zee Revocable Living Trust
of July 2009, her one-half undivided interest in the following described real property in the County
of Los Angeles, State of California:

SEE ATTACHED LEGAL DESCRIPTION

Commonly known as: 12066 Downey Avenue, Downey California 90242
Assessors Parcel No: 6258-007-041

Dated *12/1/2010*                     *Elizabeth Ann Van Zee*
                                       Elizabeth Ann Van Zee,
State of *Arizona*                )
                                  ) ss:
County of *Maricopa*              )

On this *1st* day of *December*       , 2010, before me, *Brian Robert Baggett,* the undersigned
Notary Public, personally appeared *Elizabeth Ann Van Zee* who proved to me on the basis
of satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacities, and that by his
signature on the instrument the persons, or the entity upon behalf of which the persons acted,
executed the instrument.  I certify under PENALTY OF PERJURY under the laws of the State of
California that the foregoing paragraph is true and correct.

WITNESS MY HAND AND OFFICIAL SEAL.

Signature: _____
Mail tax statements to: Elizabeth Van Zee
                        P. O. Box 35413
                        Phoenix, AZ 85069-5413

Brian Robert Baggett
NOTARY PUBLIC -- ARIZONA
MARICOPA COUNTY
My Commission Expires
July 20, 2012

*ORIGINAL*

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

3

EXHIBIT "A"

A TRACT OF LAND IN THE RANCHO SANTA GERTRUDES BOUNDED AND DESCRIBED
AS FOLLOWS:
BEGINNING AT A POINT IN THE EAST LINE OF DOWNEY ROAD, FORMERLY COLLEGE
ROAD AT THE SOUTHWEST CORNER OF THE LAND CONVEYED TO LEVI ULLERY BY
DEED RECORDED IN BOOK 734, PAGE 229 OF DEEDS, RECORDS OF LOS ANGELES
COUNTY, AND RUNNING THENCE EASTERLY ALONG THE SOUTHERLY LINE OF SAID
LAND AND THE PROLONGATION THEREOF, 345' MORE OR LESS OF THE WESTERLY
LINE OF THE LAND CONVEYED TO DON W. PRATT BY DEED RECORDED IN BOOK
3305, PAGE 202 OF DEED, RECORDS OF SAID COUNTY; THENCE NORTHERLY ALONG
THE WESTERLY LINE OF THE LAND SO CONVEYED TO SAID DON W. PRATT, 126.251';
THENCE WESTERLY PARALLEL WITH THE LINE FIRST DESCRIBED 345', MORE OR
LESS TO THE EASTERLY LINE OF SAID COLLEGE ROAD, AND THENCE SOUTHERLY
ALONG THE EASTERLY LINE OF SAID ROAD, 126.251' TO THE PLACE OF BEGINNING

EXCEPT FOR THE NORTHERLY 60' THEREOF.

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1



**This page is part of your document - DO NOT DISCARD**



# 20191007816



**Pages:**
**0026**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**09/26/19 AT 08:00AM**

| | |
|---|---|
| FEES: | 139.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 364.00 |





**L E A D S H E E T**



201909263310005

**00017211592**



010155395

**SEQ:**
**01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**



FSJP-3071900484

*E629179*

56

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

RECORDING REQUESTED BY
**CHICAGO TITLE COMPANY**
FSJP-3071900484

*RECORDING REQUESTED BY*
*AND WHEN RECORDED MAIL TO:*

PKN INVESTMENTS, LLC, A CALIFORNIA
LIMITED LIABILITY COMPANY
629 S. HILL STREET #711
LOS ANGELES, CA 90014
Loan No. PB18631
APN #6258-007-041
**COUNTY: LOS ANGELES**

*Exempt from fee per GC 27388 1 (a) (1); fee cap of $225 reached.*

**DEED OF TRUST,
ASSIGNMENT OF RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

ATTENTION COUNTY RECORDER:  THIS INSTRUMENT IS INTENDED TO BE
EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING
PURSUANT TO SECTION 9402 OF THE CALIFORNIA COMMERCIAL CODE.
PORTIONS OF THE GOODS COMPRISING A PART OF THE MORTGAGED
PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE LAND
DESCRIBED IN EXHIBIT A HERETO.  THIS INSTRUMENT IS TO BE FILED FOR
RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON
REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A
DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES.
THE ADDRESSES OF BORROWER (DEBTOR) AND LENDER (SECURED PARTY)
ARE SPECIFIED IN THE FIRST PARAGRAPH ON PAGE 1 OF THIS INSTRUMENT.

THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE
FILING (the "**Instrument**") is made to be effective **September 16, 2019**, by **PHILIP H. INMAN, AN
UNMARRIED MAN**, whose address is **2042 PALMETTO TERRACE, FULLERTON, CA  92831**, as trustor
("**Borrower**"), to **C.N.A. FORECLOSURE SERVICES, INC., A CALIFORNIA CO**, as trustee, to whom
Borrower does grant Power of Sale ("**Trustee**"), for the benefit of **PKN INVESTMENTS, LLC, A CALIFORNIA
LIMITED LIABILITY COMPANY**, whose address is **629 S. HILL STREET #711 LOS ANGELES, CA 90014**,
as beneficiary (jointly and severally referred to herein in the singular as "**Lender**").
Borrower in consideration of the Indebtedness and the trust created by this Instrument, irrevocably grants, conveys
and assigns to Trustee, in trust, with power of sale, the Mortgaged Property, including the Land located in **LOS
ANGELES** County, State of **California** and described in Exhibit A attached to this Instrument and is described as
**12066 DOWNEY AVENUE, DOWNEY, CA  90242**.
TO SECURE TO LENDER the repayment of the Indebtedness evidenced by Borrower's Promissory Note
payable to Lender, dated as of the date of this Instrument, in the principal amount of **Two hundred Ten thousand
dollars (US $210,000.00)**, and all renewals, extensions and modifications of the Indebtedness, the payment of all
sums advanced by or on behalf of Lender to protect the security of this Instrument under Section 12, and the
performance of the covenants and agreements of Borrower contained in the Loan Documents.
Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the
right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is
unencumbered, except as shown on the schedule of exceptions to coverage in the title policy issued to and accepted
by Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in
the Mortgaged Property (the "**Schedule of Title Exceptions**").  Borrower covenants that Borrower will warrant and

**PAGE 1 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

**Covenants.** In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows:

    **1.**    **DEFINITIONS.** The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

    (a)    **"Assignment"** means, collectively, the provisions of Sections 3 and 4 of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property.

    (b)    **"Attorneys' Fees and Costs"** means (i) fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including costs of Lender's and Loan Servicer's in-house counsel, support staff costs, costs of preparing for litigation, computerized research, telephone and facsimile transmission expenses, mileage, deposition costs, postage, duplicating, process service, videotaping and similar costs and expenses; (ii) costs and fees of expert witnesses, including appraisers; and (iii) investigatory fees.

    (c)    **"Borrower"** means all persons or entities identified as "Borrower" in the first paragraph of this Instrument, together with their successors and assigns.

    (d)    **"Borrower Certification"** means that certain Borrower Certification dated the same date as this Instrument, executed by Borrower in favor of Lender.

    (e)    **"Collateral Agreement"** means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account.

    (f)    **"Controlling Entity"** means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or a Controlling Interest of the limited partnership interests in Borrower (if Borrower is a partnership or joint venture), (B) a manager's interest in Borrower or a Controlling Interest of the ownership or membership interests in Borrower (if Borrower is a limited liability company), or (C) a Controlling Interest of any class of voting stock of Borrower (if Borrower is a corporation).

    (g)    **"Controlling Interest"** means (i) 51 percent or more of the ownership interests in an entity, or (ii) a percentage ownership interest in an entity of less than 51 percent, if the owner(s) of that interest actually direct(s) the business and affairs of the entity without the requirement of consent of any other party.

    (h)    **"Environmental Indemnity"** means that certain Environmental Indemnity Agreement dated the same date as this Instrument, executed by Borrower, as Indemnitor, in favor of Lender, as Indemnitee.

    (i)    **"Environmental Permit"** means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

    (j)    **"Event of Default"** means the occurrence of any event listed in Section 23.

    (k)    **"Fixtures"** means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

    (l)    **"Governmental Authority"** means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

    (m)    **"Hazard Insurance"** is defined in Section 20.

    (n)    **"Hazardous Materials"** means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or

**PAGE 2 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(o)        "**Hazardous Materials Laws**" means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*, the Toxic Substance Control Act, 15 U.S.C. Section 2601, *et seq.*, the Clean Water Act, 33 U.S.C. Section 1251, *et seq.*, the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

(p)        "**Impositions**" and "**Imposition Deposits**" are defined in Section 7(a).

(q)        "**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(r)        "**Indebtedness**" means the principal of, interest at the fixed or variable rate set forth in the Note on, and all other amounts due at any time under, the Note, this Instrument or any other Loan Document, including prepayment premiums, late charges, default interest, and advances as provided in Section 12 to protect the security of this Instrument.

(s)        "**Initial Owners**" means, with respect to Borrower or any other entity, the person(s) or entity(ies) that (i) on the date of the Note, or (ii) on the date of a Transfer to which Lender has consented, own in the aggregate 100% of the ownership interests in Borrower or that entity.

(t)        "**Land**" means the land described in Exhibit A.

(u)        "**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property, and all modifications, extensions or renewals.

(v)        "**Lender**" means the entity identified as "Lender" in the first paragraph of this Instrument, or any subsequent holder of the Note.

(w)        "**Loan Documents**" means the Note, this Instrument, the Assignment, the Borrower Certification, the Environmental Indemnity, all guaranties, all indemnity agreements, all Collateral Agreements, O&M Programs, and any other documents now or in the future executed by Borrower, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time.

(x)        "**Loan Servicer**" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the loan evidenced by the Note for the benefit of Lender. Unless Borrower receives notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

(y)        "**Mortgaged Property**" means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) the Fixtures; (4) the Personalty; (5) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated; (6) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement; (7) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof; (8) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations; (9) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; (10) all Rents and Leases; (11) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds

**PAGE 3 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

of the loan secured by this Instrument and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents; (12) all Imposition Deposits; (13) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated); (14) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits; and (15) all names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property.

(z)      **"Note"** means the Promissory Note described on page 1 of this Instrument, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended from time to time.

(aa)      **"O&M Program"** shall have the meaning as defined in the Environmental Indemnity.

(bb)      **"Personalty"** means all: (i) accounts (including deposit accounts); (ii) equipment and inventory owned by Borrower, which are used now or in the future in connection with the ownership, management or operation of the Land or Improvements or are located on the Land or Improvements, including furniture, furnishings, machinery, building materials, goods, supplies, tools, books, records (whether in written or electronic form), computer equipment (hardware and software); (iii) other tangible personal property including ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances (other than Fixtures); (iv) any operating agreements relating to the Land or the Improvements; (v) any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements; (vi) all other intangible property, general intangibles and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land and including subsidy or similar payments received from any sources, including a governmental authority; and (vii) any rights of Borrower in or under letters of credit.

(cc)      **"Property Jurisdiction"** is defined in Section 31(a).

(dd)      **"Rents"** means all rents, revenues and other income of the Land or the Improvements, including parking fees and vending machine income and fees and charges for other services provided at the Mortgaged Property, whether now due, past due, or to become due, and deposits forfeited by tenants.

(ee)      **"Taxes"** means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(ff)      **"Transfer"** is defined in Section 22.

2.      **UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.**

(a)      This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, **"UCC Collateral"**), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require. Without the prior written consent of Lender, Borrower shall not create or permit to exist any other lien or security interest in any of the UCC Collateral. Unless Borrower gives Notice to Lender within 30 calendar days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (i) change its name, identity, structure or jurisdiction of organization; (ii) change the location of its place of business (or chief executive office if more than one place of business); or (iii) add to or change any location at which any of the Mortgaged Property is stored, held or located. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

3.      **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**

(a)      As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents

**PAGE 4 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in this Security Instrument. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this Instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities. Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall cooperate with Lender's collection of such Rents.

(c)    Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than one (1) month prior to the due dates of such Rents.

(d)    If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including computer files and other records on

**PAGE 5 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)    If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property, by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law.

(f)    If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 12.

(g)    Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

**Violation of Governmental Requirements.** If Borrower suspects any tenant or other occupant of the Property is using the Property in a manner that is not in compliance with any Governmental Requirement to which Borrower, tenant, or any other occupant of the Mortgaged Property is subject, Borrower shall immediately take appropriate action to remedy the violation, and shall notify Lender of any potential violation within one (1) day of discovery of any such potential violation.

The failure of Borrower, any tenant, or any other occupant of the Property to comply with any Governmental Requirements in accordance with the lease section above and any potential violation by a tenant or other occupant of the Property of any Governmental Requirement is an Event of Default.

**4.    ASSIGNMENT OF LEASES; LEASES AFFECTING THE MORTGAGED PROPERTY.**

(a)    As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all of Borrower's right, title and interest in, to and under the Leases, including Borrower's right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all of Borrower's right, title and interest in, to and under the Leases. Borrower and Lender intend this assignment of the Leases to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of the Leases, and for no other purpose, the Leases shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in this Security Instrument. However, if this present, absolute and unconditional assignment of the Leases is not enforceable by its terms under the laws of the Property Jurisdiction, then the Leases shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this Instrument create and perfect a lien on the Leases in favor of Lender, which lien shall be effective as of the date of this Instrument.

(b)    Until Lender gives notice to Borrower of Lender's exercise of its rights under this Section 4, Borrower shall have all rights, power and authority granted to Borrower under any Lease (except as otherwise limited by this Section or any other provision of this Instrument), including the right, power and authority to modify the terms of any Lease or extend or terminate any Lease. Upon the occurrence of an Event of Default, the permission given to Borrower pursuant to the preceding sentence to exercise all rights, power and authority under Leases shall automatically terminate. Borrower shall comply with and observe Borrower's obligations under all Leases, including Borrower's obligations pertaining to the maintenance and disposition of tenant security deposits.

(c)    Borrower acknowledges and agrees that the exercise by Lender, either directly or by a receiver, of any of the rights conferred under this Section 4 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and the Improvements. The acceptance by Lender of the assignment of the Leases pursuant to Section 4(a) shall not at any time or in any event obligate Lender to take any action under this Instrument or to expend any money or to incur any expenses. Lender shall not be liable in any way for any injury or damage to person or property sustained by any person or persons, firm or corporation in or about the Mortgaged Property. Prior to Lender's actual entry into and taking possession of the Mortgaged Property, Lender shall not (i) be obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease), (ii) be obligated to appear in or defend any action or proceeding relating to the Lease or the Mortgaged Property; or (iii) be responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property. The execution of this Instrument by Borrower shall constitute conclusive evidence that all

**PAGE 6 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking of possession.

(d)    Upon delivery of notice by Lender to Borrower of Lender's exercise of Lender's rights under this Section 4 at any time after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction. Lender immediately shall have all rights, powers and authority granted to Borrower under any Lease, including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease.

(e)    Borrower shall, promptly upon Lender's request, deliver to Lender an executed copy of each Lease then in effect.

(f)    Borrower further covenants with Lender that (i) all Leases shall be written on a standard form of lease that has been or will be approved in writing in advance by Lender; (ii) upon request, Borrower shall furnish Lender with executed copies of all Leases and all amendments thereto; (iii) no material changes may be made to the Lender-approved standard lease without the prior written consent of Lender; (iv) all renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates and shall be arm's-length transactions; (v) all Leases shall provide that (A) they are subordinate to this Security Instrument and any other indebtedness now or hereafter secured by the Mortgaged Property, (B) Lessees agree to attorn to Lender (such attornment to be effective upon Lender's acquisition of title to the Mortgaged Property), (C) Lessees agree to execute such further evidences of attornment as Lender may from time to time request, (D) the attornment of Lessees shall not be terminated by foreclosure, (E) Lender may, at Lender's option. accept or reject such attornment, and (F) Lessees agree to execute and acknowledge a subordination, attornment and non-disturbance agreement in form and content acceptable to Lender, and, two times in any calendar year, as Lender may request, a certificate signed by Lessee confirming and containing such factual certifications and representations deemed appropriate by Lender; (vi) Borrower shall not grant any purchase options without the prior written approval of Lender, and (vii) all new Leases shall be subject to the prior written approval of Lender.

(g)    Borrower shall not receive or accept Rent under any Lease for more than one (1) month in advance.

(h). Borrower's Interest. Borrower is the sole owner of its entire interest as lessor under each Lease, has not executed any other assignment of any of the Leases or Rents, and has not done and shall not do anything that might prevent Lender from fully exercising its rights under this assignment.

(i). Leases Valid. The Leases are valid and enforceable in accordance with their terms and have not been altered, modified, amended, terminated, or renewed, nor have any of the terms and conditions of the Leases been waived in any manner except as approved in writing by Lender.

(j). Only Occupancy Lease. No Leases for occupancy of space within the Mortgaged Property have been or shall be entered into except for actual occupancy by the Tenants under such Leases. "Tenants" shall mean all tenants, lessees, subtenants, licensees, occupants, or similar parties to Leases for occupancy of space within the Mortgaged Property and their successors and assigns.

(k). No Defaults. No defaults presently exist under any of the Leases, and no state of facts exists that, with the giving of notice, lapse of time, or both, would constitute a default under any of the Leases; Borrower shall fulfill or perform each and every condition and covenant of each of the Leases by Borrower to be fulfilled or performed, give prompt notice to Lender of any notice of default either given or received by Borrower under any of the Leases, together with a complete copy of any such notice; 'and Borrower shall, at the sole cost and expense of Borrower, enforce, short of termination of any Lease, the performance or observance of all covenants and conditions of all such Leases by the Tenant{s) to be performed or observed.

(l). No Other Assignments. Borrower shall not, without Lender's prior written consent, execute any other assignment of the Leases or Rents.

(m). No Merger. Each Lease shall remain in full force and effect regardless of any merger under the Lease of the interests of any parties to it.

**PAGE 7 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

(n). Statements. Borrower shall furnish to Lender, within 30 calendar days after Lender's request to do so, a written statement containing the names of all Tenants of the Mortgaged Property, the terms of their respective Leases, the designation of the spaces occupied, and the Rents paid.

(o). Leases. Borrower shall not, without Lender's prior written consent, (A) execute any future Leases of any portion of the Mortgaged Property; (B) terminate or consent to the cancellation or surrender of any Leases of the Mortgaged Property or of any part of it, having an unexpired term of six (6) months or more; (C) modify, alter, or amend any Leases, including, without limitation, shortening any unexpired term, decreasing the amount of the Rents payable. altering the structure of buildings or improvements within the Mortgaged Property or changing Its use; (D) accept prepayments more than 30 calendar days before the due date of any installments of the Rents to become due and payable under any Leases; (E) accept any security deposit equal to more than two (2) months of any such installments of Rents; (F) consent to an assignment or subletting of the Mortgaged Property, In whole or in part, except as required under the Leases as approved by Lender; (G) consent to any settlement or compromise conditioned on acceptance of less than full payment of the amounts due In connection with any Lease whether under bankruptcy or applicable non bankruptcy law; or (H) cause or permit any Leases to be subordinated to any lien on the Mortgaged Property, except for the lien of the Deed of Trust.

(p). Prior Approval; No Set-Off. All Leases entered into by Borrower after the date of this Assignment shall be subject to the prior review and approval of Lender and shall be in form and content acceptable to Lender. If Borrower becomes aware that any of the Tenants he proposes to do, or is doing any act that may give rise to set-off rights against the Rents, Borrower shall immediately (a) take such measures as shall be reasonably calculated to prevent the accrual of any such rights of set-off; (b) notify Lender of all measures so taken and of the amount of set-offs claimed by such Tenants; and (c) within 10 calendar days after the accrual of any set-off rights against the Rents, reimburse Tenants who have acquired such rights, in full or take such other measures as shall effectively discharge such setoffs and ensure that Rents due thereafter shall continue to be payable without claims of setoff or deduction.

(q). Termination Payments. If any lease is terminated before its stated term has expired, all payments made by the Tenants in conjunction with such termination (including, but not limited to, voluntary buyout or termination payments, or payments made by or on the Tenants' behalf, incident to the Tenants' rejecting the lease in accordance with the federal Bankruptcy Code (or similar state creditors' rights laws», shall be made directly to lender, and Borrower shall have no right to any such payments. lender shall, in its reasonable discretion, apply such payments toward the Indebtedness due under the Note or toward the Mortgaged Property, including maintenance and repairs, payment of insurance premiums and taxes, and prevention of waste.

**5.   PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS; PREPAYMENT PREMIUM.** Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents. Borrower shall pay a prepayment premium in connection with certain prepayments of the Indebtedness, including a payment made after Lender's exercise of any right of acceleration of the Indebtedness, as provided in the Note.

**6.   EXCULPATION.** Borrower's personal liability for payment of the Indebtedness and for performance of the other obligations to be performed by it under this Instrument is limited in the manner. and to the extent, provided in the Note.

**7.   DEPOSITS FOR TAXES, INSURANCE AND OTHER CHARGES.**

(a)    Borrower shall deposit with Lender on the day monthly installments of principal or interest, or both, are due under the Note (or on another day designated in writing by Lender), until the Indebtedness is paid in full, an additional amount sufficient to accumulate with Lender the entire sum required to pay, when due (1) any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property, (2) the premiums for fire and other hazard insurance, rent loss insurance and such other insurance as Lender may require under Section 20, (3) Taxes, and (4) amounts for other charges and expenses which Lender at any time reasonably

**PAGE 8 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably estimated from time to time by Lender, plus one-sixth of such estimate. The amounts deposited under the preceding sentence are collectively referred to in this Instrument as the **"Imposition Deposits"**. The obligations of Borrower for which the Imposition Deposits are required are collectively referred to in this Instrument as **"Impositions"**. The amount of the Imposition Deposits shall be sufficient to enable Lender to pay each Imposition before the last date upon which such payment may be made without any penalty or interest charge being added. Lender shall maintain records indicating how much of the monthly Imposition Deposits and how much of the aggregate Imposition Deposits held by Lender are held for the purpose of paying Taxes, insurance premiums and each other obligation of Borrower for which Imposition Deposits are required. Any waiver by Lender of the requirement that Borrower remit Imposition Deposits to Lender may be revoked by Lender, in Lender's discretion, at any time upon notice to Borrower.

(b)     Imposition Deposits shall be held in an institution (which may be Lender, if Lender is such an institution) whose deposits or accounts are insured or guaranteed by a federal agency. Lender shall not be obligated to open additional accounts or deposit Imposition Deposits in additional institutions when the amount of the Imposition Deposits exceeds the maximum amount of the federal deposit insurance or guaranty. Lender shall apply the Imposition Deposits to pay Impositions so long as no Event of Default has occurred and is continuing. Unless applicable law requires, Lender shall not be required to pay Borrower any interest, earnings or profits on the Imposition Deposits. Borrower hereby pledges and grants to Lender a security interest in the Imposition Deposits as additional security for all of Borrower's obligations under this Instrument and the other Loan Documents. Any amounts deposited with Lender under this Section 7 shall not be trust funds, nor shall they operate to reduce the Indebtedness, unless applied by Lender for that purpose under Section 7(e).

(c)     If Lender receives a bill or invoice for an Imposition, Lender shall pay the Imposition from the Imposition Deposits held by Lender. Lender shall have no obligation to pay any Imposition to the extent it exceeds Imposition Deposits then held by Lender. Lender may pay an Imposition according to any bill, statement or estimate from the appropriate public office or insurance company without inquiring into the accuracy of the bill, statement or estimate or into the validity of the Imposition.

(d)     If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition exceeds the amount reasonably deemed necessary by Lender plus one-sixth of such estimate, the excess shall be credited against future installments of Imposition Deposits. If at any time the amount of the Imposition Deposits held by Lender for payment of a specific Imposition is less than the amount reasonably estimated by Lender to be necessary plus one-sixth of such estimate, Borrower shall pay to Lender the amount of the deficiency within 15 calendar days after written request by Lender.

(e)     If an Event of Default has occurred and is continuing, Lender may apply any Imposition Deposits, in any amounts and in any order as Lender determines, in Lender's discretion, to pay any Impositions or as a credit against the Indebtedness. Upon payment in full of the Indebtedness, Lender shall refund to Borrower any Imposition Deposits held by Lender.

8.     **COLLATERAL AGREEMENTS.** Borrower shall deposit with Lender such amounts as may be required by any Collateral Agreement and shall perform all other obligations of Borrower under each Collateral Agreement.

9.     **APPLICATION OF PAYMENTS.** If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction. Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

10.     **COMPLIANCE WITH LAWS.** Borrower shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, fair housing, zoning and land use, and Leases. Borrower also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 10. Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property. Borrower represents and warrants to

**PAGE 9 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

**11.     USE OF PROPERTY.**  Unless required by applicable law, Borrower shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, or (b) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (c) establish any condominium or cooperative regime with respect to the Mortgaged Property.

**12.     PROTECTION OF LENDER'S SECURITY.**

(a)     If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out of pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required (4) payment of amounts which Borrower has failed to pay.

(b)     Any amounts disbursed by Lender under this Section, or under any other provision of this Instrument that treats such disbursement as being made under this Section, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the **"Default Rate"**, as defined in the Note.

(c)     Nothing in this Section shall require Lender to incur any expense or take any action.

**13.     CHARGES; LIENS.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust including borrower's covenants to make payments when due.  Additionally, borrower shall pay all taxes, assessments, charges, including garbage billings, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 7.

**All Property Assessed Clean Energy assessment/liens ("PACE") (or similar type program) are prohibited.  In the event that a PACE assessment/lien becomes a lien on the Property and becomes a part of the payment of property taxes or becomes senior to this Security Instrument in any way, Borrower shall be in breach of the Note and this Security Instrument and Lender has the right to take all acts set forth in Security Instrument and to accelerate this Loan.  The loan shall be in default and Lender may proceed under Section 23 of this Security Instrument. This supersedes any and all conflicting language regarding taxes, liens and assessments in this Security Instrument.**

**Lender may order a one-time tax service which borrower shall be responsible for payment.**

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 calendar days of the date on which that notice is given (excluding Deed of Trust liens, which need no notice), Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 13. Failure to do so by Borrower, may result in Lender accelerating the Note under Section 22.

**14.     INSPECTION.** Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

**PAGE 10 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

15.    **BOOKS AND RECORDS; FINANCIAL REPORTING.**

(a)    Borrower shall keep and maintain at all times at the Mortgaged Property or the management agent's offices, and upon Lender's request shall make available at the Mortgaged Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Mortgaged Property, and copies of all written contracts, Leases, and other instruments which affect the Mortgaged Property. The books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Borrower shall furnish to Lender all of the following:

(1)    within 120 calendar days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Mortgaged Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Mortgaged Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Mortgaged Property as of the end of that fiscal year;

(2)    within 120 calendar days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Mortgaged Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)    within 120 calendar days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)    within 120 calendar days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and any Controlling Entity and the interest held by each, if Borrower or a Controlling Entity is a corporation, all officers and directors of Borrower and the Controlling Entity, and if Borrower or a Controlling Entity is a limited liability company, all managers who are not members;

(5)    upon Lender's request, quarterly income and expense statements for the Mortgaged Property;

(6)    upon Lender's request at any time when an Event of Default has occurred and is continuing, monthly income and expense statements for the Mortgaged Property;

(7)    upon Lender's request, a monthly property management report for the Mortgaged Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(8)    upon Lender's request, a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year; and

(9)    within thirty (30) calendar days after filing, copies of all federal and state income tax returns filed by Borrower.

(c)    Each of the statements, schedules and reports required by Section 14(b) shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require. Lender also may require that any statements, schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)    In the event Borrower fails to deliver such reports within the time frames provided in Section 14(b) above, then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to two percent (2%) of the monthly payment amount for each late submission of financial reports to compensate Lender or its servicer for the additional administrative expense caused by such failure or delay whether or not Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any of the remedies. Failure to provide any reports as required by this Section 14 shall constitute an Event of Default hereunder. Such late charge shall be charged each month that any financial statements remain delinquent. The late charge shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness as provided for in

**PAGE 11 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

this Security Instrument. The financial statement late charge shall be in addition to any other remedies available to Lender as a result of Borrower's default. In no event shall the financial statement late charge constitute a cure of Borrower's default in failing to provide financial statements, nor limit Lender's remedies as a result of such default. In addition, if Borrower fails to provide in a timely manner the statements, schedules and reports required by Section 14(b), then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness as provided in this Security Instrument.

(e)    If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Mortgaged Property or its operation.

(f)    Borrower authorizes Lender to obtain a credit report on Borrower at any time.

**16.    TAXES; OPERATING EXPENSES.**

(a)    Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists and Borrower has timely delivered to Lender any bills or premium notices that it has received, Borrower shall not be obligated to pay Taxes, insurance premiums or any other individual Imposition to the extent that sufficient Imposition Deposits are held by Lender for the purpose of paying that specific Imposition. If an Event of Default exists, Lender may exercise any rights Lender may have with respect to Imposition Deposits without regard to whether Impositions are then due and payable. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition Deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above.

(d)    Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender, which may include the delivery to Lender of the reserves established by Borrower to pay the contested Imposition.

(e)    Borrower shall promptly deliver to Lender a copy of all notices of, and invoices for, Impositions, and if Borrower pays any Imposition directly, Borrower shall promptly furnish to Lender receipts evidencing such payments.

**17.    LIENS; ENCUMBRANCES.** Borrower acknowledges that the grant, creation or existence of any mortgage, deed of trust, deed to secure debt, security interest or other lien or encumbrance (a "**Lien**") on the Mortgaged Property (other than the lien of this Instrument and the Approved Second Deed of Trust) or on certain ownership interests in Borrower, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the lien of this Instrument, is a "**Transfer**" which constitutes an Event of Default under Section 23 of this Instrument and subjects Borrower to full personal liability under the Note.

**18.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.** Borrower (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in good repair, including the replacement of Personalty and Fixtures with items of equal or better function and quality, (e) shall provide for professional management of the Mortgaged Property by a property manager satisfactory to Lender under a contract approved by Lender in writing, and (f) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Borrower shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Personalty.

**Should this loan fall into default for any reason or fall under any other city, county or states ordinance notification/correction situation (i.e. vacant property), borrower agrees to pay any and all**

**PAGE 12 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

ordinance/registration fees to the city/county, corrective fees/charges when due, or advanced by lender. In addition, should inspections be required, borrower understands that they are responsible for the fees of all said inspections. These could be monthly inspections, depending upon the requirement of the lender and/or county/city/state regulation.

19.    **ENVIRONMENTAL HAZARDS.**    Borrower shall comply with all covenants, conditions, provisions and obligations of Borrower (as Indemnitor) under the Environmental Indemnity Agreement.

20.    **PROPERTY AND LIABILITY INSURANCE.**

(a)    Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness. If Lender so requires, such insurance shall also include sinkhole insurance, mine subsidence insurance, earthquake insurance, and, if the Mortgaged Property does not conform to applicable zoning or land use laws, building ordinance or law coverage. If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood. All insurance required pursuant to this Section 20(a) shall be referred to as "**Hazard Insurance.**"

(b)    All premiums on insurance policies required under Section 20(a) shall be paid in the manner provided in Section 7, unless Lender has designated in writing another method of payment. All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in favor of, and in a form approved by, Lender. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 20(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 calendar days prior to the expiration date of a policy, Borrower shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)    Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time require.

(d)    All insurance policies and renewals of insurance policies required by this Section 20 shall be in such amounts and for such periods as Lender may from time to time require, shall be in such form and contain such endorsements as Lender may from time to time require, and shall be issued by insurance companies satisfactory to Lender.

(e)    Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Borrower to maintain.

(f)    In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "**Restoration**"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

(g)    Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty.

**PAGE 13 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

(h)    If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

(i)    **Any cost of acquiring evidence of insurance from current insurance producer, shall be a cost of the Borrower. It will be treated as an advance and charged interest thereon from date cost is paid by Lender and/or Lender's agent to date advance is repaid to Lender by Borrower. Advancing fee applies. Additionally, should Borrower not supply evidence of insurance sufficient for Lender's requirement and an insurance binder must be place by the Lender and/or Lender's agent, the binder fee shall be charged to the Borrower in addition to the cost of Lender placed insurance.**

21.    **CONDEMNATION.**

(a)    Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "**Condemnation**").    Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing.    Borrower authorizes and appoints Lender as attorney-in-fact for Borrower to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any Condemnation and to settle or compromise any claim in connection with any Condemnation. This power of attorney is coupled with an interest and therefore is irrevocable.    However, nothing contained in this Section 21 shall require Lender to incur any expense or take any action.    Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)    Lender may apply such awards or proceeds, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower.    Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 7 of this Instrument or any Collateral Agreement, or change the amount of such installments.    Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

22.    **TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER [NO RIGHT TO TRANSFER]. All transfers shall cause the entire debt to be called due and payable without notice to Borrower.**

(a)    "**Transfer**" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity.    "Transfer" does not include (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale under this Instrument or (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code.    For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer. A transfer shall constitute a default under the terms of this loan and said loan may be declared due in full at that time.

(b)    "Transfer" does not include: (i) ) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (ii) a lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

(c)    The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 22(a) to the contrary:

(1)    a Transfer to which Lender has consented;

(2)    a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person (unless such death itself is an Event of Default under Section 22(k) the Deed of Trust);

(3)    the grant of a leasehold interest approved in writing by Lender;

**PAGE 14 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

       (4)       a Transfer of obsolete or worn out Personalty or Fixtures that are contemporaneously replaced by items of equal or better function and quality, which are free of liens, encumbrances and security interests other than those created by the Loan Documents or consented to by Lender;

       (5)       the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses incurred by Lender in connection with reviewing Borrower's request; and

       (6)       the creation of a mechanic's, materialman's, or judgment lien against the Mortgaged Property which is released of record or otherwise remedied to Lender's satisfaction within 60 calendar days of the date of creation.

    (d)      The occurrence of any of the following Transfers shall not constitute an Event of Default under this Instrument, provided that Borrower has notified Lender in writing within 30 calendar days following the occurrence of any of the following, and such Transfer does not constitute an Event of Default under any other Section of this Instrument:

       (i)       a change of the Borrower's name, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

       (ii)       a change of the form of the Borrower not involving a transfer of the Borrower's assets and not resulting in any change in liability of any Initial Owner, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

       (iii)      the merger of the Borrower with another entity when the Borrowing entity is the surviving entity;

       (iv)      the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses, including Attorneys' Fees and Costs, incurred by Lender in connection with reviewing Borrower's request.

    (e)      The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

       (1)       a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property (including without limitation the creation or existence of any Lien as provided in Section 17 of the Deed of Trust);

       (2)       if Borrower is a limited partnership, a Transfer of (A) any general partnership interest, or (B) limited partnership interests in Borrower that would cause the Initial Owners of Borrower to own less than a Controlling Interest of all limited partnership interests in Borrower;

       (3)       if Borrower is a general partnership or a joint venture, a Transfer of any general partnership or joint venture interest in Borrower;

       (4)       if Borrower is a limited liability company, (A) a Transfer of any membership interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the membership interests in Borrower, (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of a manager, or (C) a change of a nonmember manager;

       (5)       if Borrower is a corporation, (A) the Transfer of any voting stock in Borrower which would cause the Initial Owners to own less than a Controlling Interest of any class of voting stock in Borrower or (B) if the outstanding voting stock in Borrower is held by 100 or more shareholders, one or more transfers by a single transferor within a 12-month period affecting an aggregate of 5% or more of that stock;

       (6)       if Borrower is a trust, (A) a Transfer of any beneficial interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the beneficial interests in Borrower, or (B) the termination or revocation of the trust, or (C) the removal, appointment or substitution of a trustee of Borrower; and

       (7)       a Transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an Event of Default under any of Sections 22(e) through (6) above.

**PAGE 15 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 22.

**23.    EVENTS OF DEFAULT.**  The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

(a)    any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document;

(b)    any failure by Borrower to maintain the insurance coverage required by Section 20;

(c)    any default on senior liens including taxes and/or assessments

(d)    fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners or managers or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e)    any Event of Default under Section 22;

(f)    the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property;

(g)    any failure by Borrower to perform any of its obligations under this Instrument, as and when required.  However, no such notice or grace period shall apply in the case of any such failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Instrument, result in harm to Lender, impairment of the Note or this Instrument or any other security given under any other Loan Document;

(h)    any failure by Borrower to perform any of its obligations as and when required under any Loan Document other than this Instrument which continues beyond the applicable cure period, if any, specified in that Loan Document;

(i)    any exercise by the holder of any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(j)    Borrower makes a general assignment for the benefit of creditors, voluntarily files for bankruptcy protection under the United States Bankruptcy Code or voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or an involuntary case is commenced against Borrower by any creditor (other than Lender) of Borrower pursuant to the United States Bankruptcy Code or other federal or state law affecting debtor and creditor rights and is not dismissed or discharged within 60 calendar days after filing; and

(k)    Borrower (if Borrower is a natural person) or any general partner or trustee or guarantor who is a natural person dies, or becomes incompetent, or purports to revoke or dispute the validity of, or liability under, any of the Loan Documents or any guaranty; provided, however, that in the event of a death, Lender, in its sole, absolute and unfettered discretion, may permit the deceased Borrower's, general partner's, or guarantor's estate or the successor trustee or beneficiaries of the trust to assume unconditionally the obligations of such deceased person under the Loan Documents and/or guaranty, in a manner satisfactory to Lender, and, in doing so, cure such Event of Default.

**24.    REMEDIES CUMULATIVE.**  Each right and remedy provided in this Instrument is distinct from all other rights or remedies under this Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

**25.    FORBEARANCE.**

(a)    Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions:  extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this Instrument, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this Instrument, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this Instrument, the Note, or any other Loan Document.

(b)    Any forbearance by Lender in exercising any right or remedy under the Note, this Instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy.  The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies

**PAGE 16 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender. Lender's receipt of any awards or proceeds under Sections 20 and 21 shall not operate to cure or waive any Event of Default.

**26.      LOAN CHARGES.**  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation. The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness. For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note. Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

**27.      WAIVER OF STATUTE OF LIMITATIONS.**  Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce any Loan Document.

**28.      OMITTED.**

**29.      FURTHER ASSURANCES.**  Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

**30.      ESTOPPEL CERTIFICATE.**  Within 10 calendar days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note; (iii) the date to which interest under the Note has been paid; (iv) that Borrower is not in default in paying the Indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument or any of the other Loan Documents (or, if the Borrower is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

**31.      GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.**

(a)      This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Broker is located (the **"Property Jurisdiction"**) unless the law specifically governs otherwise.

(b)      Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the Indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

**32.**      All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's Mailing Address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Mailing Address unless Borrower has designated a substitute notice address by notice to Lender.

**Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.**

**PAGE 17 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument. Borrower requests that a copy of any Notice of Default and any Notice of Sale hereunder be mailed to Borrower at the Mailing Address stated herein, unless Borrower has designated another address by Notice to Lender.

**33.    SALE OF NOTE; CHANGE IN SERVICER.**  The Note or a partial interest in the Note (together with this Instrument and the other Loan Documents) may be sold one or more times without prior notice to Borrower. A sale may result in a change of the Loan Servicer.  There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

**34.    SUCCESSORS AND ASSIGNS BOUND.**  This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower.  However, a Transfer not permitted by Section 22 shall be an Event of Default.

**35.    JOINT AND SEVERAL LIABILITY.**  If more than one person or entity signs this Instrument as Borrower, the obligations of such persons and entities under this Instrument, the Note and other Loan Documents shall be joint and several.

**36.    RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.**

(a)    The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)    No creditor of any party to this Instrument and no other person shall be a third party beneficiary of this Instrument or any other Loan Document. Without limiting the generality of the preceding sentence, (1) any arrangement (a **"Servicing Arrangement"**) between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

**37.    SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.**  The parties intend that the provisions of this Instrument and all other Loan Documents, including the Promissory Note evidencing the indebtedness secured hereby, shall be legally severable.  If any term or provision of this Instrument or any other Loan Document, including the Promissory Note evidencing the indebtedness secured hereby, be determined to any extent by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document, including the aforesaid Promissory Note, shall not be affected thereby and each term and provision shall be valid and be enforceable to the fullest extent permitted by law.  This Instrument and the aforesaid Promissory Note contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument.  This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

**38.    CONSTRUCTION.**  The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument.  Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument.  All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument.  Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.  Use of the singular in this Agreement includes the plural and use of the plural includes the singular.  As used in this Instrument, the term "including" means "including, but not limited to."

**39.    LOAN SERVICING.**  All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Loan Servicer unless Borrower receives notice to the contrary.  If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

**40.    DISCLOSURE OF INFORMATION.**  Lender may furnish information regarding Borrower or the Mortgaaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, purchase or securitization of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of similar mortgage loans.  Borrower irrevocably waives any and all rights it may have under applicable law to prohibit such disclosure, including but not limited to any right of privacy.

**PAGE 18 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

**41.    NO CHANGE IN FACTS OR CIRCUMSTANCES.**  All information in the application for the loan submitted to Lender (the "**Loan Application**") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

**42.    SUBROGATION.**  If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "**Prior Lien**"), such loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part. be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Prior Lien, whether or not the Prior Lien is released.

**43.    ACCELERATION; REMEDIES.**  If an Event of Default has occurred, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by California law or provided in this Instrument or in any other Loan Document.  Borrower acknowledges that the power of sale granted in this Instrument may be exercised by Lender without prior judicial hearing.  Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

If the power of sale is invoked, Lender shall execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Mortgaged Property to be sold and shall cause the notice to be recorded in each county in which the Mortgaged Property or some part of the Mortgaged Property is located.  Trustee shall give notice of default and notice of sale and shall sell the Mortgaged Property according to California law.  Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine.  Trustee may postpone the sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale.  Lender or Lender's designee may purchase the Mortgaged Property at any sale.

Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Mortgaged Property so sold without any express or implied covenant or warranty.  The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made in those recitals.  Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including Trustee's fees not to exceed 5% of the gross sales price, attorneys' fees and costs of title evidence; (b) to the Indebtedness in such order as Lender, in Lender's discretion, directs; and (c) the excess, if any, to the person or persons legally entitled to the excess.

**44.    RECONVEYANCE.**  Upon payment of the Indebtedness, Lender shall request Trustee to reconvey the Mortgaged Property and shall surrender this Instrument and the Note to Trustee.  Trustee shall reconvey the Mortgaged Property without warranty to the person or persons legally entitled to the Mortgaged Property.  Such person or persons shall pay Trustee's reasonable costs incurred in so reconveying the Mortgaged Property.

**45.    SUBSTITUTE TRUSTEE.**  Lender, at Lender's option, may from time to time, by a written instrument, appoint a successor trustee, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Mortgaged Property is situated, shall be conclusive proof of proper substitution of the successor trustee.  The successor trustee shall, without conveyance of the Mortgaged Property, succeed to all the title, power and duties conferred upon the Trustee in this Instrument and by California law.  The instrument of substitution shall contain the name of the original Lender, Trustee and Borrower under this Instrument, the book and page where this Instrument is recorded, and the name and address of the successor trustee.  If notice of default has been recorded, this power of substitution cannot be exercised until after the costs, fees and expenses of the then acting Trustee have been paid to such Trustee, who shall endorse receipt of those costs, fees and expenses upon the instrument of substitution.  The procedure provided for substitution of trustee in this Instrument shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

**46.    STATEMENT OF OBLIGATION.**  Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

**47.    SPOUSE'S SEPARATE PROPERTY.**  Each Borrower who is a married person expressly agrees that recourse may be had against his or her separate property.

**48.    FIXTURE FILING.**  This Instrument is also a fixture filing under the Uniform Commercial Code of California.

**49.    ADDITIONAL PROVISION REGARDING APPLICATION OF PAYMENTS.**  In addition to the provisions of Section 9, Borrower further agrees that, if Lender accepts a guaranty of only a portion of the Indebtedness, Borrower waives its right under California Civil Code Section 2822(a), to designate the portion of the Indebtedness which shall be satisfied by a guarantor's partial payment.

**PAGE 19 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

**50.    WAIVER OF MARSHALLING; OTHER WAIVERS.**  To the extent permitted by law, Borrower waives (i) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Mortgaged Property, (ii) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshalling in the event of foreclosure of the lien created by this Instrument, (iii) all rights and remedies which Borrower may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (iv) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any other obligation secured by this Instrument, and (v) any rights, legal or equitable, to require marshalling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433.  If the Mortgaged Property consists of several lots, parcels or items of property, Beneficiary may: (a) designate the order in which such lots, parcels or items shall be offered for sale or sold. or (b) elect to sell such lots, parcels or items through a single sale, or through two or more successive sales, or in any other manner Beneficiary deems in its best interest.  Any person, including Trustor, Trustee or Beneficiary, may purchase at any sale hereunder, and Beneficiary shall have the right to purchase at any sale hereunder by crediting upon the bid price the amount of all or any part of the indebtedness hereby secured. Should Beneficiary desire that more than one sale or other disposition of the Mortgaged Property be conducted, Beneficiary may, at its option, cause the same to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Beneficiary may deem to be in its best interests, and no such sale shall terminate or otherwise affect the lien of this Deed of Trust on any part of the Mortgaged Property not sold until all indebtedness secured hereby has been fully paid.  In the event Beneficiary elects to dispose of the Mortgaged Property through more than one sale, Trustor agrees to pay the costs and expenses of each such sale and of any judicial proceedings wherein the same may be made, including reasonable compensation to Trustee and Beneficiary, their agents and counsel, and to pay all expenses, liabilities and advances made or incurred by Trustee in connection with such sale or sales, together with interest on all such advances made by Trustee at the lower of the rate set forth in the Note, or the maximum rate permitted by law to be charged by Trustee.

**51.    INTERPRETATION.**  It is the intention of Borrower and Lender that if any provision of this Instrument or any other Loan Document is capable of two (2) constructions, one of which would render the provision void, and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid.  Borrower acknowledges that Lender has attempted in good faith to assure that this Instrument, the Note and all other Loan Documents are in compliance with applicable laws of the Property Jurisdiction and federal laws.  Nevertheless, in the event that any provision of this Instrument, the Note or any other Loan Document is not in compliance with any such laws, then the non-complying provision shall be deemed to be deleted or modified to the extent necessary to assure legal compliance.  Similarly, in the event any language or disclosure required by applicable laws of the Property Jurisdiction is not contained in the Loan Documents, then the Loan Documents shall be deemed to have been supplemented to add such language or disclosure, or, at Lender's option, Lender may provide such additional language or disclosure.  In either event, such legal requirement shall thereby be satisfied and such noncompliance shall be deemed to have been cured for all purposes.  Within ten (10) calendar days after written request by Lender, Borrower agrees to execute such documentation as Lender may require to cure any legal compliance issues or deficiencies in the Loan Documents.

**52.    FUTURE ADVANCES.**  In addition to the Indebtedness, this Instrument shall (to the extent allowed by applicable law) also secure payment of the principal, interest and other charges due on all other future loans or advances made by Lender to Borrower (or any successor in interest to Borrower as the owner of all or any part of the Mortgaged Property) when the promissory note evidencing such loan or advance specifically states that it is secured by this Instrument (**"Future Advances"**), including all extensions, renewals and modifications of any such Future Advances.

**53.    AGREEMENT TO PROVIDE ADDITIONAL DOCUMENTS.**  Borrower agrees to execute and acknowledge such additional documents as may be necessary or desirable in order to carry out the intent and purpose of this Instrument and the other Loan Documents, to confirm or establish the lien hereof, or to correct any clerical errors or legal deficiencies.  Without limiting the foregoing, Borrower agrees to execute a replacement Note in the event the Note is lost or destroyed and to execute an amended and restated substitute Note to correct any clerical or other errors which may be discovered in the original Note.  Failure of Borrower to comply with any request by Lender pursuant to this Section within ten (10) calendar days after written request by Lender shall constitute a material Event of Default hereunder.

**54.    SECRET PROFIT.**  Under the law. it is unlawful for a Loan Servicer to make "secret profit". Should a Loan Servicer be involved with the servicing of the Loan, a Loan Servicer may not earn interest on the funds in a trust account unless it is to the benefit of the actual owner of the funds.  This paragraph is to put Borrower on notice that although interest is not paid to the Loan Servicer, there may be a lower cost basis given by the bank

**PAGE 20 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

utilized by the Loan Servicer for the monthly analysis performed on the trust account(s). Said lower cost may be reflective of the balances in the accounts. Additionally, when there is a returned check fee being charged, the entire amount is not a "bank charge". Included in the cost of the returned check" which is delineated in the Promissory Note, Loan Servicer shall retain the difference between the "Note" charge and the actual charge by the bank as an additional work charge. In addition, should a tax service be ordered, the Loan Servicer may retain the difference between the actual cost of the service and the amount charged to the you, the Borrower. This difference is the cost for the Loan Servicer to prepare the request for service.

55.   **EXECUTION IN COUNTERPARTS.**   This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

56.   **PAYMENT OF CLOSING COSTS.** If for any reason the escrow or closing agent fails to reserve and pay for all of Lender's fees, legal, documentation, appraisal, title, recording and other closing costs incurred in connection with the closing and funding of the Loan, then Borrower shall pay or reimburse Lender for any such unpaid fees or costs within ten (10) calendar days after written demand by Lender itemizing the unpaid fees and costs. Failure of Borrower to so pay or reimburse Lender for any such unpaid fees and costs within ten (10) calendar days after written demand by Lender shall constitute an Event of Default and, without limiting any other remedies of Lender, Lender may immediately instate the Default Rate under the Note until such amounts are received by Lender.

57.   **GRIEVANCES.** Neither Borrower nor Lender may commence, join, or be joined to any judicial action, except an appointment of a receiver and/or a judicial foreclosure (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party in writing of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to this document and the notice of acceleration given to Borrower pursuant to this document shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 57.

58.   **MULTIPLE LENDER LOANS:** Pursuant to Civil Code Section 2941.9. if this Deed of Trust has more than one Beneficiary (Lender) with an undivided interest, it is subject to a signed agreement between all of the Lenders to be governed by the Lenders holding more than 50% of the record beneficial interest of this Deed of Trust. This may occur during escrow or after the close of escrow. Additionally, pursuant to Business & Professions Code Section 10238(i), the holders of more than 50% of the recorded beneficial interests of the notes or interests may govern the actions to be taken on behalf of all holders in accordance with Civil Code Section 2941.9 in the event of default or foreclosure for matters that require direction or approval of the holders, including designation of the broker, servicing agent, or other person acting on their behalf and the sale, encumbrance, or lease of real property owned by the holders resulting from foreclosure or receipt of a deed in lieu of foreclosure.

59.   **STATEMENT OF OBLIGATION FEE.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

60.   **SENIOR LIEN INFORMATION.** Lender may require information on any and all senior lien information from Borrower. Said request must be made in writing to Borrower. Borrower must submit the information to Lender within 20 calendar days of the date of request. Said information can include, but is not limited to: name of senior lien holder, balance due, payment amount, next due date, address of lien holder, phone number of lien holder, loan number and amounts advanced.

61.   **INDEMNIFICATION.** Borrower hereby agrees to indemnify, defend (with counsel of Lender's and/or Broker's choice) (as to any fees and costs are incurred or accrued) and hold Lender and Broker and their officers, agents, and representatives harmless from and against any costs, expenses (including, without limitation attorneys' fees, consulting fees and court costs), claims, demands, lawsuits, judgments, awards, or actions arising out of or related to the Property or the Loan, including, but not limited to any claims made by contractors, suppliers, mechanics lien claimants, homeowner associations, governmental authorities, stop notice claimants, title companies or persons purporting to be injured on or by the Property or by the acts or conduct of Borrower, its contractors, subcontractors, suppliers and/or other persons dealing with Borrower. If Borrower fails to provide such indemnity as the same accrues and as expenses are incurred, the amount not paid shall be added to the principal amount of the Note and bear interest thereon at the same rate then in effect (including any default rate in effect) and shall be secured by the same collateral as securing the Note and Loan Agreement.

**PAGE 21 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

**62. DOCUMENT DRAWING SERVICE.** If a document drawing service has been hired to draw loan documents, Borrower hereby agrees to indemnify and hold Document Drawing Service, its officers, agents and representatives harmless from and against any costs, expense (including, without limitation attorney fees, consulting fees and court costs).

**63. 125% TITLE INSURANCE POLICY.** Borrower agrees to allow Lender to obtain a title policy in an amount exceeding the face amount of the loan by 25% and instruct insuring title company of same. Lender and Borrower acknowledge this increase of coverage is not for the allowance of negative amortization of the principal balance. This additional coverage is to pay for losses the Lender may incur in a case which could increase the amount above the original principal balance coverage. Said losses could include delinquent interest, late charges, attorney fees, advances for insurance, taxes. etc. Borrower acknowledges this increase of coverage does result in a higher fee which Borrower shall bear for the Lender title insurance policy.

**64. USURY.** This Loan is exempt from usury as it has been made or arranged by a Licensed California Real Estate Broker.

**65. Occupancy of Borrower.** If this loan has been arranged as a non-owner occupied loan, Borrower shall not move into property without written permission by Lender. Should Borrower move into subject property without approval from Lender, this shall be deemed a default under the terms of the loan.

**66. Use of Loan Funds.** Lender has loaned funds according to the what Borrower has stated as funds are to be used. Should Lender discover that funds were not used for the exact reason given in the loan/underwriting documents, this shall be deemed a default under the terms of the loan.

**67. Periodic Reports on the Status of any Business involved with regard to the making of this loan.** If this loan has been made as a "Business Purpose Loan", Lender may request from Borrower an update as to the status of the business with which the funds were to be used. Borrower will have 30 calendar days to give a written status to Lender from date Lender has requested said status. Lender to delineate what information is required as evidence of the status. Should Borrower not produce the written status within the given time period, this shall be deemed a default under the terms of the Loan.

**68. Uncashed Checks.** Should Lender or their agent issue a check to the borrower and it remains uncashed for more than 60 calendar days, a $5.00 monthly fee from date of issue may be charged should borrower request a reissue on the check. Should Borrower request the check to be reissued, in addition to the fee just stated, a stop payment and re-issue fee in the amount of $25.00 may be incurred and deducted from the funds.

**69. Agency of Loan Servicer.** The Loan Servicer or Lender under this Note may or may not have a proprietary program for forbearances, extensions or modifications. You would be advised during the course of the servicing of the loan. However, if the Loan Servicer inquires whether the Borrower would like, or should the Borrower request, an extension of the loan, forbearance, modification. etc., the Loan Servicer remains the sole agent of the Lender and is not the agent of the Borrower.

**70. Property Tax Verification.** Lender may require Borrower to pay a one-time charge for a real estate tax service and/or reporting service used by Lender in connection with this Loan. This tax service may be ordered on each Assessor's Parcel Number secured by this loan. In addition to the fee to be paid to the service, the Loan Servicer may charge a fee to prepare the documentation to order the service. Fees shall be paid by the Borrower.

**ATTACHED EXHIBIT.** The following Exhibit is attached to this Instrument:
Exhibit "A"- description of the property attached hereto and made a part hereof
APN #**6258-007-041**

# AS TO AN UNDIVIDED 50% INTEREST ONLY

**PAGE 22 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

      **THIS DEED OF TRUST SECURES A FIXED RATE PROMISSORY NOTE. NO FURTHER ENCUMBRANCES MAY BE RECORDED AGAINST THE REAL PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF LENDER. FAILURE TO COMPLY WITH THIS PROVISION SHALL CONSTITUTE AN EVENT OF DEFAULT AND AT THE LENDER'S OPTION THE LOAN SHALL IMMEDIATELY BECOME DUE AND PAYABLE. CONSENT TO ONE FURTHER ENCUMBRANCE SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO REQUIRE SUCH CONSENT TO FUTURE OR SUCCESSIVE ENCUMBRANCES.**

      **IN WITNESS WHEREOF,** Borrower has signed and delivered this Instrument or has caused this Instrument to be signed and delivered by its duly authorized representative.

**BORROWER:**

**PHILIP H. INMAN** - Borrower / Date

The primary person responsible for the origination of this loan is POUYAN BROUKHIM NMLS #348736 CALDRE #01384244 employed by PB FINANCIAL GROUP CORP. NMLS #348736 CALDRE #01522495.

**PAGE 23 OF 24**

79

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }
County of _Orange_____ }

On _September 20, 2019_____ before me, _Silvia Llamas_____, NOTARY PUBLIC, personally appeared _Philip H. Inman_____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

SILVIA LLAMAS
Notary Public - California
Orange County
Commission # 2248039
My Comm. Expires Jul 24, 2022

**PAGE 24 OF 24**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

## EXHIBIT "A"
### Legal Description

**For APN/Parcel ID(s):  6258-007-041**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF DOWNEY, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**AS TO AN UNDIVIDED 50% INTEREST:**

A tract of land in the Rancho Santa Gertudes, in the City of Downey, County of Los Angeles, State of California, described as follows:

Beginning at a point in the East line of Downey Road, formerly College Road, at the Southwest corner of the land conveyed to Levi Ullery, by Deed recorded in Book 737, Page 229 of Deeds, Records of said County and running thence Easterly along the Southerly line of said land and the prolongation thereof, 345 feet more or less to the Westerly line of the land conveyed to Don W. Pratt, by Deed recorded in Book 3305, Page 202 of Deeds, Records of said County; thence Northerly along the Westerly line of the land conveyed to said Don W. Pratt, 126.251 feet; thence Westerly parallel with the line first described 345 feet, more or less, to the Easterly line of said College Road; and thence Southerly along the Easterly line of said Road, 126.251 feet to the place of beginning.

Excepting therefrom the Northerly 60 feet thereof.

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

ASSESSOR'S MAP
COUNTY OF LOS ANGELES, CALIF.

M.B. 366 - 14 - 15
M.B. 628 - 31 - 32

TRACT NO. 13703
TRACT NO. 24263

RANCHO SANTA GERTRUDES FINALLY
CONFIRMED TO J.P. MᶜFARLAND &
J. G. DOWNEY       P.I - 156 - 158
TRACT NO. 12768    M.B. 242 - 35 - 36
TRACT NO. 14735    M.B. 312 - 21

CODE
3266

FOR PREV. ASSM'T SEE
6258 - 7 & 10

6258    7
SCALE 1"    100

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1



DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 1

 

**This page is part of your document - DO NOT DISCARD**

## 20180027939



**Pages:
0017**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**01/10/18 AT 08:00AM**

| | |
|---|---|
| FEES: | 86.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 150.00 |
| PAID: | 236.00 |





**L E A D S H E E T**



201801100200014

**00014760844**



008836865

**SEQ:
01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

FSJP-307180000+

E497023

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

**RECORDING REQUESTED BY:**
Chicago Title Company
**Order No.:** FSJP-3071800001

**When Recorded Mail Document and Tax
Statement To:**
PKN Investments, LLC
629 S Hill Street, #711
Los Angeles, CA 90014

APN/Parcel ID(s): 6258-007-041

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## MULTIFAMILY DEED OF TRUST
## ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

**THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**(Additional recording fee applies)**

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

WHEN RECORDED MAIL TO
PKN INVESTMENTS, LLC
629 S HILL STREET #711
LOS ANGELES, CALIFORNIA 90014

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Loan No. L171142

# MULTIFAMILY DEED OF TRUST
## ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

THIS DEED OF TRUST (herein "Instrument") is made this   2nd   day of  JANUARY, 2018
among the Trustor/Grantor,  PHILIP H. INMAN, AN UNMARRIED MAN

whose address is  2042 PALMETTO TERRACE, FULLERTON, CALIFORNIA  92831
(herein "Borrower"),

DEL TORO LOAN SERVICING
(herein "Trustee"), and

the Beneficiary,  PKN INVESTMENTS, LLC

a  CALIFORNIA                                    organized and existing under the laws of
THE STATE OF CALIFORNIA whose address is  629 S HILL STREET #711, LOS ANGELES,
CALIFORNIA 90014
(herein "Lender").
BORROWER, in consideration of the indebtedness herein recited and the trust herein created, irrevocably grants,
conveys and assigns to Trustee, in trust, with power of sale, the following described property located in
COUNTY OF LOS ANGELES              , State of  CALIFORNIA                        ;
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: 6258-007-041

THE TERMS OF THIS LOAN CONTAIN PROVISIONS WHICH MAY REQUIRE A BALLOON PAYMENT AT MATURITY.

TOGETHER with all buildings, improvements and tenements now or hereafter erected on the property, and all heretofore
or hereafter vacated alleys and streets abutting the property, and all easements, rights, appurtenances, rents (subject however
to the assignment of rents to Lender herein), royalties, mineral, oil and gas rights and profits, water, water rights, and water
stock appurtenant to the property, and all fixtures, machinery, equipment, engines, boilers, incinerators, building materials,
appliances and goods of every nature whatsoever now or hereafter located in, or on, or used, or intended to be used in
connection with the property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling,
electricity, gas, water, air and light; and all elevators, and related machinery and equipment, fire prevention and extinguishing
apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains
and curtain rods, mirrors, cabinets, paneling, rugs, attached floor coverings, furniture, pictures, antennas, trees and plants,
and

all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the real property covered
by this Instrument; and all of the foregoing, together with said property (or the leasehold estate in the event this Instrument
is on a leasehold) are herein referred to as the "Property".

TO SECURE TO LENDER (a) the repayment of the indebtedness evidence by Borrower's note dated
JANUARY 2, 2018           (herein "Note") in the principal sum of  90,000.00

Dollars, with interest thereon, with the balance of the indebtedness, if not sooner paid, due and payable on
FEBRUARY 1, 2021        , and all renewals, extensions and modifications thereof; (b) the repayment of any future
advances, with interest thereon, made by Lender to Borrower pursuant to paragraph 33 hereof (herein "Future Advances");
(c) the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this
Instrument; and (d) the performance of the covenants and agreements of Borrower herein contained.
Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant, convey
and assign the Property (and, if this Instrument is on a leasehold, that the ground lease is in full force and effect without
modification except as noted above and without default on the part of either lessor or lessee thereunder), that the Property is

MULTIFAMILY DEED OF TRUST ASSIGNMENT OF RENTS AND SECURITY AGREEMENT
M.DOT 02/06/15                              Page 1 of 9                              DocMagic *eForms*
www.docmagic.com

M dot.xml

86

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

unencumbered, and that Borrower will warrant and defend generally the title to the Property against all claims and demands, subject to any easements and restrictions listed in a schedule of exceptions to coverage in any title insurance policy insuring Lender's interest in the Property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **PAYMENT OF PRINCIPAL AND INTEREST.** Borrower shall promptly pay when due the principal of and interest on the indebtedness evidenced by the Note, any prepayment and late charges provided in the Note and all other sums secured by this Instrument.

2. **FUNDS FOR TAXES, INSURANCE AND OTHER CHARGES.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly installments of principal or interest are payable under the Note (or on another day designated in writing by Lender), until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of (a) the yearly water and sewer rates and taxes and assessments which may be levied on the Property, (b) the yearly ground rents, if any, (c) the yearly premium installments for fire and other hazard insurance, rent loss insurance and such other insurance covering the Property as Lender may require pursuant to paragraph 5 hereof, (d) the yearly premium installments for mortgage insurance, if any, and (e) if this Instrument is on a leasehold, the yearly fixed rents, if any, under the ground lease, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Any waiver by Lender of a requirement that Borrower pay such Funds may be revoked by Lender, in Lender's sole discretion, at any time upon notice in writing to Borrower. Lender may require Borrower to pay to Lender, in advance, such other Funds for other taxes, charges, premiums, assessments and impositions in connection with Borrower or the Property which Lender shall reasonably deem necessary to protect Lender's interests (herein "Other Impositions"). Unless otherwise provided by applicable law, Lender may require Funds for Other Impositions to be paid by Borrower in a lump sum or in periodic installments, at Lender's option.

The Funds shall be held in an institution(s) the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said rates, rents, taxes, assessments, insurance premiums and Other Impositions so long as Borrower is not in breach of any covenant or agreement of Borrower in this Instrument. Lender shall make no charge for so holding and applying the Funds, analyzing said account or for verifying and compiling said assessments and bills, unless Lender pays Borrower interest, earnings or profits on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Instrument that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires interest, earnings or profits to be paid, Lender shall not be required to pay Borrower any interest, earnings or profits on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds in Lender's normal format showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Instrument.

If the amount of the Funds held by Lender at the time of the annual accounting thereof shall exceed the amount deemed necessary by Lender to provide for the payment of water and sewer rates, taxes, assessments, insurance premiums, rents and Other Impositions, as they fall due, such excess shall be credited to Borrower on the next monthly installment or installments of Funds due. If at any time the amount of the Funds held by Lender shall be less than the amount deemed necessary by Lender to pay water and sewer rates, taxes assessments, insurance premiums, rents and Other Impositions, as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency within thirty days after notice from Lender to Borrower requesting payment thereof.

Upon Borrower's breach of any covenant or agreement of Borrower in this Instrument, Lender may apply, in any amount and in any order as Lender shall determine in Lender's sole discretion, any Funds held by Lender at the time of application (i) to pay rates, rents, taxes, assessments, insurance premiums and Other Impositions which are now or will hereafter become due, or (ii) as a credit against sums secured by this Instrument. Upon payment in full of all sums secured by this Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

3. **APPLICATION OF PAYMENTS.** Unless applicable law provides otherwise, all payments received by Lender from Borrower under the Note or this Instrument shall be applied by Lender in the following order of priority: (i) amounts payable to Lender by Borrower under paragraph 2 hereof; (ii) interest payable on the Note; (iii) principal of the Note; (iv) interest payable on advances made pursuant to paragraph 8 hereof; (v) principal of advances made pursuant to paragraph 8 hereof; (vi) interest payable on any Future Advance, provided that if more than one Future Advance is outstanding, Lender may apply payments received among the amounts of interest payable on the Future Advances in such order as Lender, in Lender's sole discretion, may determine; (vii) principal of any Future Advance, provided that if more than one Future Advance is outstanding, Lender may apply payments received among the principal balances of the Future Advances in such order as Lender, in Lender's sole discretion, may determine; and (viii) any other sums secured by this Instrument in such order as Lender, at Lender's option, may determine; provided, however, that Lender may, at Lender's option, apply any sums payable pursuant to paragraph 8 hereof prior to interest on and principal of the Note, but such application shall not otherwise affect the order of priority of application specified in this paragraph 3.

4. **CHARGES; LIENS.** Borrower shall pay all water and sewer rates, rents, taxes, assessments, premiums, and Other Impositions attributable to the Property at Lender's option in the manner provided under paragraph 2 hereof or, if not paid in such manner, by Borrower making payment, when due, directly to the payee thereof, or in such other manner as Lender may designate in writing. Borrower shall promptly furnish to Lender all notices of amounts due under this paragraph 4, and in the event Borrower shall make payment directly, Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall promptly discharge any lien which has, or may have, priority over or equality with, the lien of this Instrument, and Borrower shall pay, when due, the claims of all persons supplying labor or materials to or in connection with the Property. Without Lender's prior written permission, Borrower shall not allow any lien inferior to this Instrument to be perfected against the Property.

5. **HAZARD INSURANCE.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured by carriers at all times satisfactory to Lender against loss by fire, hazards included within the term "extended coverage", rent loss and such other hazards, casualties, liabilities and contingencies as Lender (and, if this Instrument is on a leasehold, the

MULTIFAMILY DEED OF TRUST ASSIGNMENT OF RENTS AND SECURITY AGREEMENT
M.DOT  02/06/15
Page 2 of 9

DocMagic *eforms*
www.docmagic.com

M.dot.xml

87

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

ground lease) shall require and in such amounts and for such periods as Lender shall require. All premiums on insurance policies shall be paid, at Lender's option, in the manner provided under paragraph 2 hereof, or by Borrower making payment, when due, directly to the carrier, or in such other manner as Lender may designate in writing.

All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in form acceptable to Lender. Lender shall have the right to hold the policies, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. At least thirty days prior to the expiration date of a policy, Borrower shall deliver to Lender a renewal policy in form satisfactory to Lender. If this Instrument is on a leasehold, Borrower shall furnish Lender a duplicate of all policies, renewal notices, renewal policies and receipts of paid premiums if, by virtue of the ground lease, the originals thereof may not be supplied by Borrower to Lender.

In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and empowers Lender as attorney-in-fact for Borrower to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds: provided however, that nothing contained in this paragraph 5 shall require Lender to incur any expense or take any action hereunder. Borrower further authorizes Lender, at Lender's option, (a) to hold the balance of such proceeds to be used to reimburse Borrower for the cost of reconstruction or repair of the Property or (b) to apply the balance of such proceeds to the payment of the sums secured by this Instrument, whether or not then due, in the order of application set forth in paragraph 3 hereof (subject, however, to the rights of the lessor under the ground lease of this Instrument is on a leasehold).

If the insurance proceeds are held by Lender to reimburse Borrower for the cost of restoration and repair of the Property, the Property shall be restored to the equivalent of its original condition or such other condition as Lender may approve in writing. Lender may, at Lender's option, condition disbursement of said proceeds on Lender's approval of such plans and specifications of an architect satisfactory to Lender, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen and such other evidence of costs, percentage completion of construction, application of payments, and satisfaction of liens as Lender may reasonable require. If the insurance proceeds are applied to the payment of the sums secured by this Instrument, any such application of proceeds to principal shall not extend to postpone the due dates of the monthly installments referred to in paragraphs 1 and 2 hereof or change the amounts of such installments. If the Property is sold pursuant to paragraph 27 hereof or if Lender acquires title to the Property, Lender shall have all of the right, title and interest of Borrower in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

**6.  PRESERVATION AND MAINTENANCE OF PROPERTY; LEASEHOLDS.** Borrower (a) shall not commit waste or permit impairment or deterioration of the Property, (b) shall not abandon the Property, (c) shall restore or repair promptly and in a good and workmanlike manner all or any part of the Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, in the event of any damage, injury or loss thereto, whether or not insurance proceeds are available to cover in whole or in part the costs of such restoration or repair, (d) shall keep the Property, including improvements, fixtures, equipment, machinery and appliances thereon in good repair and shall replace fixtures, equipment, machinery and appliances on the Property when necessary to keep such items in good repair, (e) shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property, (f) shall provide for professional management of the Property by a residential rental property manager satisfactory to Lender pursuant to a contract approved by Lender in writing, unless such requirement shall be waived by Lender in writing, (g) shall generally operate and maintain the Property in a manner to ensure maximum rentals, and (h) shall give notice in writing to Lender of and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Property, the security of this Instrument or the rights or powers of Lender. Neither Borrower nor any tenant or other person shall remove, demolish or alter any improvement now existing or hereafter erected on the Property or any fixture, equipment, machinery or appliance in or on the Property except when incident to the replacement of fixtures, equipment, machinery and appliances with items of like kind.

If this Instrument is on a leasehold, Borrower (i) shall comply with the provisions of the ground lease, (ii) shall give immediate written notice to Lender of any default by lessor under the ground lease or of any notice received by Borrower from such lessor of any default under the ground lease by Borrower, (iii) shall exercise any option to renew or extend the ground lease and give written confirmation thereof to Lender within thirty days after such option becomes exercisable, (iv) shall give immediate written notice to Lender of the commencement of any remedial proceedings under the ground lease by any party thereto and, if required by Lender, shall permit Lender as Borrower's attorney-in-fact to control and act for Borrower in any such remedial proceedings and (v) shall within thirty days after request by Lender obtain from the lessor under the ground lease and deliver to Lender the lessor's estoppel certificates required thereunder, if any. Borrower hereby expressly transfers and assigns to Lender the benefit of all covenants contained in the ground lease, whether or not such covenants run with the land, but Lender shall have no liability with respect to such covenants nor any other covenants contained in the ground lease.

Borrower shall not surrender the leasehold estate and interests herein conveyed nor terminate or cancel the ground lease creating said estate and interests, and Borrower shall not, without the express written consent of Lender, alter or amend said ground lease. Borrower covenants and agrees that there shall not be a merger of the ground lease, or of the leasehold estate created thereby, with the fee estate covered by the ground lease by reason of said leasehold estate or said fee estate, or any part of either, coming into common ownership, unless Lender shall consent in writing to such merger; if Borrower shall acquire such fee estate, then this Instrument shall simultaneously and without further action be spread so as to become a lien on such fee estate.

**7.  USE OF PROPERTY.** Unless required by applicable law or unless Lender has otherwise agreed in writing, Borrower shall not allow changes in the use for which all or any part of the Property was intended at the time this Instrument was executed. Borrower shall not initiate or acquiesce in a change in the zoning classification of the Property without Lender's prior written consent.

**8.  PROTECTION OF LENDER'S SECURITY.** If Borrower fails to perform the covenants and agreements contained in this Instrument, or if any action or proceeding is commenced which affects the Property or title thereto or the interest of Lender therein, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such action as Lender deems necessary, in its sole discretion, to protect Lender's interest, including, but not limited to, (i)

MULTIFAMILY DEED OF TRUST ASSIGNMENT OF RENTS AND SECURITY AGREEMENT
M.DOT  02/06/15                                    Page 3 of 9

DocMagic *ePrints*
www.docmagic.com

M.dot.xml

88

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

disbursement of attorney's fees, (ii) entry upon the Property to make repairs, (iii) procurement of satisfactory insurance as provided in paragraph 5 hereof, and (iv) if this Instrument is on a leasehold, exercise of any option to renew or extend the ground lease on behalf of Borrower and the curing of any default of Borrower in the terms and conditions of the ground lease.

Any amounts disbursed by Lender pursuant to this paragraph 8, with interest thereon, shall become additional indebtedness of Borrower secured by this Instrument. Unless Borrower and Lender agree to other terms of payment, such amounts shall be immediately due and payable and shall bear interest from the date of disbursement at the rate stated in the Note unless collection from Borrower of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law. Borrower hereby covenants and agrees that Lender shall be subrogated to the lien of any mortgage or other lien discharged, in whole or in part, by the indebtedness secured hereby. Nothing contained in this paragraph 8 shall require Lender to incur any expense or take any action hereunder.

**9. INSPECTION.** Lender may make or cause to be made reasonable entries upon and inspections of the Property.

**10. BOOKS AND RECORDS.** Borrower shall keep and maintain at all times at Borrower's address stated below, or such other place as Lender may approve in writing, complete and accurate books of accounts and records adequate to reflect correctly the results of the operation of the Property and copies of all written contracts, leases and other instruments which affect the Property. Such books, records, contracts, leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender. Upon Lender's request, Borrower shall furnish to Lender, within one hundred and twenty days after the end of each fiscal year of Borrower, a balance sheet, a statement of income and expenses of the Property and a statement of changes in financial position, each in reasonable detail and certified by Borrower and, if Lender shall require, by an independent certified public accountant. Borrower shall furnish, together with the foregoing financial statements and at any other time upon Lender's request, a rent schedule for the Property, certified by Borrower, showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable and the rent paid.

**11. CONDEMNATION.** Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, and Borrower shall appear in and prosecute any such action or proceeding unless otherwise directed by Lender in writing. Borrower authorizes Lender, at Lender's option, as attorney-in-fact for Borrower, to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation or other taking of the Property, whether direct or indirect, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any condemnation or other taking, whether direct or indirect, of the Property, or part thereof, or for conveyances in lieu of condemnation, are hereby assigned to and shall be paid to Lender subject, if this Instrument is on a leasehold, to the rights of lessor under the ground lease.

Borrower authorizes Lender to apply such awards, payments, proceeds or damages, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, to restoration or repair of the Property or to payment of the sums secured by this Instrument, whether or not then due, in the order of application set forth in paragraph 3 hereof, with the balance, if any, to Borrower. Unless Borrower and Lender otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in paragraphs 1 and 2 hereof or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards, proceeds, damages or claims arising in connection with such condemnation or taking as Lender may require.

**12. BORROWER AND LIEN NOT RELEASED.** From time to time, Lender may, at Lender's option, without giving notice to or obtaining the consent of Borrower, Borrower's successors or assigns or of any junior lienholder or guarantors, without liability on Lender's part and notwithstanding Borrower's breach of any covenant or agreement of Borrower in this Instrument, extend the time for payment of said indebtedness or any part thereof, reduce the payments thereon, release anyone liable on any of said indebtedness, accept a renewal note or notes therefor, modify the terms and time of payment of said indebtedness, release from the lien of this Instrument any part of the Property, take or release other or additional security, reconvey any part of the Property, consent to any of map or plan of the Property, consent to the granting of any easement, join in any extension or subordination agreement, and agree in writing with Borrower to modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable thereunder. Any actions taken by Lender pursuant to the terms of this paragraph 12 shall not affect the obligation of Borrower or Borrower's successors or assigns to pay the sums secured by this Instrument and to observe the covenants of Borrower contained herein, shall not affect the guaranty of any person, corporation, partnership or other entity for payment of the indebtedness secured hereby, and shall not affect the lien or priority of lien hereof on the Property. Borrower shall pay Lender a reasonable service charge, together with such title insurance premiums and attorney's fees as may be incurred at Lender's option, for any such action if taken at Borrower's request.

**13. FORBEARANCE BY LENDER NOT A WAIVER.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of any sum secured by this Instrument after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Instrument, nor shall Lender's receipt of any awards, proceeds or damages under paragraphs 5 and 11 hereof operate to cure or waive Borrower's default in payment of sums secured by this Instrument.

**14. ESTOPPEL CERTIFICATE.** Borrower shall within ten days of a written request from Lender furnish Lender with a written statement, duly acknowledged, setting forth the sums secured by this Instrument and any right of set-off, counterclaim or other defense which exists against such sums and the obligations of this Instrument.

**15. UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.** This Instrument is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified above as part of the Property which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and Borrower hereby grants

MULTIFAMILY DEED OF TRUST ASSIGNMENT OF RENTS AND SECURITY AGREEMENT
M.DOT 02/06/15     Page 4 of 9     DocMagic *eForms*
www.docmagic.com

M-dot.xml

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

Lender a security interest in said items. Borrower agrees that Lender may file this Instrument, or a reproduction thereof, in the real estate records or other appropriate index, as a financing statement for any of the items specified above as part of the Property. Any reproduction of this Instrument or of any other security agreement or financing statement shall be sufficient as a financing statement. In addition, Borrower agrees to execute and deliver to Lender, upon Lender's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Instrument in such form as Lender may require to perfect a security interest with respect to said items. Borrower shall pay all costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements Lender may reasonably require. Without the prior written consent of Lender, Borrower shall not create or suffer to be created pursuant to the Uniform Commercial Code any other security interest in said items, including replacements and additions thereto. Upon Borrower's breach of any covenant or agreement of Borrower contained in this Instrument, including the covenants to pay when due all sums secured by this Instrument, Lender shall have the remedies of a secured party under the Uniform Commercial Code and, at Lender's option, may also invoke the remedies provided in paragraph 27 of this Instrument as to such items. In exercising any of said remedies, Lender may proceed against the items of real property and any items of personal property specified above as part of the Property separately or together and in any order whatsoever, without in any way affecting the availability of Lender's remedies under the Uniform Commercial Code or of the remedies provided in paragraph 27 of this Instrument.

**16. LEASES OF THE PROPERTY.** As used in this paragraph 16, the word "lease" shall mean "sublease" if this Instrument is on a leasehold. Borrower shall comply with and observe Borrower's obligations as landlord under all leases of the Property or any part thereof. Borrower will not lease any portion of the Property for non-residential use except with the prior written approval of Lender. Borrower, at Lender's request, shall furnish Lender with executed copies of all leases now existing or hereafter made of all or any part of the Property, and all leases now or hereafter entered into will be in form and substance subject to the approval of Lender. All leases of the Property shall specifically provide that such leases are subordinate to this Instrument; that the tenant attorns to Lender, such attornment to be effective upon Lender's acquisition of title to the Property; that the tenant agrees to execute such further evidences of attornment as Lender may from time to time request; that the attornment of the tenant shall not be terminated by foreclosure; and that Lender may, at Lender's option, accept or reject such attornments. Borrower shall not, without Lender's written consent, execute, modify, surrender or terminate, either orally or in writing, any lease now existing or hereafter made of all or any part of the Property providing for a term of three years or more, permit an assignment or sublease of such a lease without Lender's written consent, or request or consent to the subordination of any lease of all or any part of the Property to any lien subordinate to this Instrument. If Borrower becomes aware that any tenant proposes to do, or is doing, any act or thing which may give rise to any right of set-off against rent, Borrower shall (i) take such steps as shall be reasonably calculated to prevent the accrual of any right to a set-off against rent, (ii) notify Lender thereof and of the amount of said set-offs, and (iii) within ten days after such accrual, reimburse the tenant who shall have acquired such right to set-off or take such other steps as shall effectively discharge such set-off and as shall assure that rents thereafter due shall continue to be payable without set-off or deduction.

Upon Lender's request, Borrower shall assign to Lender, by written instrument satisfactory to Lender, all leases now existing or hereafter made of all or any part of the Property and all security deposits made by tenants in connection with such leases of the Property. Upon assignment by Borrower to Lender of any leases of the Property, Lender shall have all of the rights and powers possessed by Borrower prior to such assignment and Lender shall have the right to modify, extend or terminate such existing leases and to execute new leases, in Lender's sole discretion.

**17. REMEDIES CUMULATIVE.** Each remedy provided in this Instrument is distinct and cumulative to all other rights or remedies under this Instrument or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

**18. ACCELERATION IN CASE OF BORROWER'S INSOLVENCY.** If Borrower shall voluntarily file a petition under the Federal Bankruptcy Act, as such Act may from time to time be amended, or under any similar or successor Federal statute relating to bankruptcy, insolvency, arrangements or reorganizations, or under any state bankruptcy or insolvency act, or file an answer in an involuntary proceeding admitting insolvency or inability to pay debts, or if Borrower shall fail to obtain a vacation or stay of involuntary proceedings brought for the reorganization, dissolution or liquidation of Borrower, or if Borrower shall be adjudged a bankrupt, or if a trustee or receiver shall be appointed for Borrower or Borrower's property, or if the Property shall become subject to the jurisdiction of a Federal bankruptcy court or similar state court, or if Borrower shall make an assignment for the benefit of Borrower's creditors, or if there is an attachment, execution or other judicial seizure of any portion of Borrower's assets and such seizure is not discharged within ten days, then Lender may, at Lender's option, declare all of the sums secured by this Instrument to be immediately due and payable without prior notice to Borrower, and Lender may invoke any remedies permitted by paragraph 27 of this Instrument. Any attorney's fees and other expenses incurred by Lender in connection with Borrower's bankruptcy or any of the other aforesaid events shall be additional indebtedness of Borrower secured by this Instrument pursuant to paragraph 8 hereof.

**19. TRANSFERS OF THE PROPERTY OR BENEFICIAL INTERESTS IN BORROWER; ASSUMPTION.** On sale or transfer of (i) all or any part of the Property, or any interest therein, or (ii) beneficial interests in Borrower (if Borrower is not a natural person or persons but is a corporation, partnership, trust or other legal entity), Lender may, at Lender's option, declare all of the sums secured by this Instrument to be immediately due and payable, and Lender may invoke any remedies permitted by paragraph 27 of this Instrument. This option shall not apply in case of

(a)     transfers by devise or descent or by operation of law upon the death of a joint tenant or a partner;

(b)     sales or transfers when the transferee's creditworthiness and management ability are satisfactory to Lender and transferee has executed, prior to the sale or transfer, a written assumption agreement containing such terms as Lender may require, including, if required by Lender, an increase in the rate of interest payable under the Note;

(c)     the grant of a leasehold interest in a part of the Property of three years or less (or such longer lease term as Lender may permit by prior written approval) not containing an option to purchase (except any interest in the ground lease, if this Instrument is on a leasehold);

(d)     sales or transfers of beneficial interest in Borrower provided that such sales or transfers, together with any prior sales or transfers of beneficial interest in Borrower, but excluding sales or transfers under subparagraphs (a) and

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

(b) above, do not result in more than 49% of the beneficial interests in Borrower having been sold or transferred since commencement of amortization of the Note; and

(e)    sales or transfers of fixtures or any personal property pursuant to the first paragraph of paragraph 6 hereof.

**20. NOTICE.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Instrument or in the Note shall be given by mailing such notice by certified mail addressed to Borrower at Borrower's address stated below or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail, return receipt requested, to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein.  Any notice provided for in this Instrument or in the Note shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**21. SUCCESSORS AND ASSIGNS BOUND; JOINT AND SEVERAL LIABILITY; AGENTS; CAPTIONS.**  The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 19 hereof.  All covenants and agreements of Borrower shall be joint and several.  In exercising any rights hereunder or taking any actions provided for herein, Lender may act through its employees, agents or independent contractors as authorized by Lender.  The captions and heading of the paragraphs of this Instrument are for convenience only and are not to be used to interpret or define the provisions hereof.

**22. UNIFORM MULTIFAMILY INSTRUMENT; GOVERNING LAW; SEVERABILITY.**  This form of multifamily instrument combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property and related fixtures and personal property.  This Instrument shall be governed by the law of the jurisdiction in which the Property is located.  In the event that any provision of this Instrument of the Note conflicts with applicable law, such conflict shall not affect other provisions of this Instrument or the Note which can be given effect without the conflicting provisions, and to this end the provisions of this Instrument and the Note are declared to be severable.  In the event that any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in this Instrument or in the Note, whether considered separately or together with other charges levied in connection with this Instrument and the Note, violates such law, and Borrower is entitled to the benefit of such law, such charge is hereby reduced to the extent necessary to eliminate such violation.  The amounts, if any, previously paid to Lender in excess of the amounts payable to Lender pursuant to such charges as reduced shall be applied by Lender to reduce the principal of the indebtedness evidenced by the Note.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all indebtedness which is secured by this Instrument or evidenced by the Note and which constitutes interest, as well as all other charges levied in connection with such indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest computed thereby is uniform throughout the stated term of the Note.

**23. WAIVER OF STATUTE OF LIMITATIONS.**  Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Instrument or to any action brought to enforce the Note or any other obligation secured by this Instrument.

**24. WAIVER OF MARSHALLING.**  Notwithstanding the existence of any other security interests in the Property held by Lender or by any other party, Lender shall have the right to determine the order in which any or all of the Property shall be subjected to the remedies provided herein.  Lender shall have the right to determine the order in which any or all portions of the indebtedness secured hereby are satisfied from the proceeds realized upon the exercise of the remedies provided herein.  Borrower, any party who consents to this Instrument and any party who now or hereafter acquires a security interest in the Property and who has actual or constructive notice hereof hereby waives any and all right to require the marshalling of assets in connection with the exercise of any of the remedies permitted by applicable law or provided herein.

**25. CONSTRUCTION LOAN PROVISIONS.**  Borrower agrees to comply with the covenants and conditions of the Construction Loan Agreement, if any, which is hereby incorporated by reference in and made a part of this Instrument.  All advances made by Lender pursuant to the Construction Loan Agreement shall be indebtedness of Borrower secured by this Instrument, and such advances may be obligatory as provided in the Construction Loan Agreement.  All sums disbursed by Lender prior to completion of the improvements to protect the security of this Instrument up to the principal amount of the Note shall be treated as disbursements pursuant to the Construction Loan Agreement.  All such sums shall bear interest from the date of disbursement at the rate stated in the Note, unless collection from Borrower of interest at such rate would be contrary to applicable law in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law and shall be payable upon notice from Lender to Borrower requesting payment therefor.

From time to time as Lender deems necessary to protect Lender's interests, Borrower shall, upon request of Lender, execute and deliver to Lender, in such form as Lender shall direct, assignments of any and all rights or claims which relate to the construction of the Property and which Borrower may have against any party supplying or who has supplied labor, materials or services in connection with construction of the Property.  In case of breach by Borrower of the covenants and conditions of the Construction Loan Agreement, Lender, at Lender's option, with or without entry upon the property, (i) may invoke any of the rights or remedies provided in the Construction loan Agreement, (ii) may accelerate the sums secured by this Instrument and invoke those remedies provided in paragraph 27 hereof, or (iii) may do both.  If, after the commencement of amortization of the Note, the Note and this Instrument are sold by Lender, from and after such sale the Construction loan Agreement shall cease to be a part of this Instrument and Borrower shall not assert any right of set-off, counterclaim or other claim or defense arising out of or in connection with the Construction Loan Agreement against the obligations of the Note and this Instrument.

**26. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**  As part of the consideration for the indebtedness evidenced by the Note, Borrower hereby absolutely and unconditionally assigns and transfers to Lender all the rents and revenues of the Property, including those now due, past due, or to become due by virtue of any lease

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

or other agreement for the occupancy or use of all or any part of the Property, regardless of to whom the rents and revenues of the Property are payable. Borrower hereby authorizes Lender or Lender's agents to collect the aforesaid rents and revenues and hereby directs each tenant of the Property to pay such rents to Lender or Lender's agents; provided, however, that prior to written notice given by Lender to Borrower of the breach by Borrower of any covenant or agreement of Borrower in this Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower, to apply the rents and revenues so collected to the sums secured by this Instrument in the order provided in paragraph 3 hereof with the balance, so long as no such breach has occurred, to the account of Borrower, it being intended by Borrower and Lender that this assignment of rents constitutes an absolute assignment and not an assignment for additional security only. Upon delivery of written notice by Lender to Borrower of the breach by Borrower of any covenant or agreement of Borrower in this Instrument, and without the necessity of Lender entering upon and taking and maintaining full control of the Property in person, by agent or by a court-appointed receiver, Lender shall immediately be entitled to possession of all rents and revenues of the Property as specified in this paragraph 26 as the same become due and payable, including but not limited to rents then due and unpaid, and all such rents shall immediately upon delivery of such notice be held by Borrower as trustee for the benefit of Lender only; provided, however, that the written notice by Lender to Borrower of the breach by Borrower shall contain a statement that Lender exercises its rights to such rents. Borrower agrees that commencing upon delivery of such written notice of Borrower's breach by Lender to Borrower, each tenant of the Property shall make such rents payable to and pay such rents to Lender or Lender's agents on Lender's written demand to each tenant therefor, delivered to each tenant personally, by mail or by delivering such demand to each rental unit, without any liability on the part of said tenant to inquire further as to the existence of a default by Borrower.

Borrower hereby covenants that Borrower has not executed any prior assignment of said rents, that Borrower has not performed, and will not perform, any acts or has not executed, and will not execute, any instrument which would prevent Lender from exercising its rights under this paragraph 26, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any of the rents of the Property for more than two months prior to the due dates of such rents. Borrower covenants that Borrower will not hereafter collect or accept payment of any rents of the Property more than two months prior to the due dates of such rents. Borrower further covenants that Borrower will execute and deliver to Lender such further assignments of rents and revenues of the Property as Lender may from time to time request.

Upon Borrower's breach of any covenant or agreement of Borrower in this Instrument, Lender may in person, by agent or by a court-appointed receiver, regardless of the adequacy of Lender's security, enter upon and take and maintain full control of the Property in order to perform all acts necessary and appropriate for the operation and maintenance thereof including, but not limited to, the execution, cancellation or modification of leases, the collection of all rents and revenues of the Property, the making of repairs to the Property and the execution or termination of contracts providing for the management or maintenance of the Property, all on such terms as are deemed best to protect the security of this Instrument. In the event Lender elects to seek the appointment of a receiver for the Property upon Borrower's breach of any covenant or agreement of Borrower in this Instrument, Borrower hereby expressly consents to the appointment of such receiver. Lender or the receiver shall be entitled to receive a reasonable fee for so managing the Property.

All rents and revenues collected subsequent to delivery of written notice by Lender to Borrower of the breach by Borrower of any covenant or agreement of Borrower in this Instrument shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the Property, premiums on insurance policies, taxes, assessments and other charges on the Property, and the costs of discharging any obligation or liability of Borrower as lessor or landlord of the Property and then to the sums secured by this Instrument. Lender or the receiver shall have access to the books and records used in the operation and maintenance of the Property and shall be liable to account only for those rents actually received. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Property by reason of anything done or left undone by Lender under this paragraph 26.

If the rents of the Property are not sufficient to meet the costs, if any, of taking control of and managing the Property and collecting the rents, any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by this Instrument pursuant to paragraph 8 hereof. Unless Lender and Borrower agree in writing to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof and shall bear interest from the date of disbursement at the rate stated in the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate which may be collected from Borrower under applicable law.

Any entering upon and taking and maintaining of control of the Property by Lender or the receiver and any application of rents as provided herein shall not cure or waive any default hereunder or invalidate any other right or remedy of Lender under applicable law or provided herein. This assignment of rents of the Property shall terminate at such time as this Instrument ceases to secure indebtedness held by lender.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follow:

27. **ACCELERATION; REMEDIES.** Upon Borrower's breach of any covenant or agreement of Borrower in this Instrument, including, but not limited to, the covenants to pay when due any sums secured by this Instrument, Lender at Lender's option may declare all of the sums secured by this Instrument to be immediately due and payable without further demand, and may invoke the power of sale and any other remedies permitted by applicable law or provided herein. Borrower acknowledges that the power of sale herein granted may be exercised by lender without prior judicial hearing. Borrower has the right to bring an action to assert the non-existence of a breach or any other defense of Borrower to acceleration and sale. Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including, but not limited to, attorney's fees and costs of documentary evidence, abstracts and title reports.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which the Property or some part thereof is located. Trustee shall give notice of default and notice of sale and shall sell the Property according to the laws of California. Trustee may sell the Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee my determine. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Property at any sale.

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all costs and expenses of the sale, including, but not limited to, Trustee's and attorney's fees and costs of title evidence; (b) to all sums secured by this Instrument in such order as Lender, in Lender's sole discretion, directs; and (c) the excess, if any, to the person or persons legally entitled thereto.

**28. RECONVEYANCE.** Upon payment of all sums secured by the Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Instrument and all notes evidencing indebtedness secured by this Instrument to Trustee. Trustee shall convey the Property without warranty to the person or persons legally entitled thereto. Such person or persons shall pay Trustee's reasonable costs incurred in so reconveying the Property.

**29. SUBSTITUTE TRUSTEE.** Lender, at Lender's option, may from time to time, by an instrument in writing, appoint a successor trustee to any Trustee appointed hereunder, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Property is situated, shall be conclusive proof of proper substitution of such successor trustee. The successor trustee shall, without conveyance of the Property, succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. Said instrument shall contain the name of the original Lender, Trustee and Borrower hereunder, the book and page where this Instrument is recorded, and the name and address of the successor trustee. If notice of default has been recorded, this power of substitution cannot be exercised until after the costs, fees and expenses of the then acting Trustee have been paid to such Trustee who shall endorse receipt thereof upon such instrument of substitution. The procedure herein provided for substitution of trustee shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

**30. REQUEST FOR NOTICES.** Borrower requests that copies of the notice of default and notice of sale be sent to Borrower at Borrower's address stated below.

**31. STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

**32. SPOUSE'S SEPARATE PROPERTY.** Any Borrower who is a married person expressly agrees that recourse may be had against his or her separate property.

**33. FUTURE ADVANCES.** Upon request of Borrower, Lender, at Lender's option so long as this Instrument secures indebtedness held by Lender, may make Future Advances to Borrower. Such Future Advances, with interest thereon, shall be secured by this Instrument when evidenced by promissory notes stating that said notes are secured hereby. At no time shall the principal amount of the indebtedness secured by this Instrument, not including sums advanced in accordance herewith to protect the security of this Instrument, exceed the original amount of the Note (U.S. $  90,000.00            ) plus the additional sum of US $  0.00

IN WITNESS WHEREOF, BORROWER has executed this Instrument or has caused the same to be executed by its representatives thereunto duly authorized.

_____        _____
PHILIP H. INMAN

_____        _____

_____        _____

Borrower's Address

_2042 PALMETTO TERRACE_____

_FULLERTON, CALIFORNIA  92831_____

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

--------- [Space Below This Line For Acknowledgment] ---------

**ACKNOWLEDGMENT**

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of CALIFORNIA                    )

County of ~~LOS ANGELES~~ *Orange*          )

On _January 8, 2018_ before me, *Jennifer Galvez-Arellano, Notary Public,*

personally appeared _PHILIP H. INMAN_ _____

_____

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JENNIFER GALVEZ-ARELLANO
Commission # 2065330
Notary Public - California
Orange County
My Comm. Expires Apr 21, 2018

NOTARY SEAL

_____
NOTARY SIGNATURE

*Jennifer Galvez-Arellano*
(Typed Name of Notary)

**REQUEST FOR FULL RECONVEYANCE**

TO TRUSTEE:

The undersigned is the holder of the note or notes secured by this Instrument. Said note or notes, together with all other indebtedness secured by this Instrument, have been paid in full. You are hereby directed to cancel said note or notes and this Instrument, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Instrument to the person or persons legally entitled thereto.

Dated: _____          _____

MULTIFAMILY DEED OF TRUST ASSIGNMENT OF RENTS AND SECURITY AGREEMENT
M.DOT 02/06/15                Page 9 of 9

DocMagic
www.docmagic.com

M.dot.xml

94

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

Loan Number: L171142

Date: JANUARY 2, 2018

Property Address: 12066 DOWNEY AVENUE
DOWNEY, CALIFORNIA 90241

## EXHIBIT "A"

## LEGAL DESCRIPTION

DocMagic EForms
www.docmagic.com

M.dot.xml

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

# EXHIBIT "A"
### Legal Description

**For APN/Parcel ID(s):  6258-007-041**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF DOWNEY, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**AS TO AN UNDIVIDED 50% INTEREST:**

A tract of land in the Rancho Santa Gertudes, in the City of Downey, County of Los Angeles, State of California, described as follows:

Beginning at a point in the East line of Downey Road, formerly College Road, at the Southwest corner of the land conveyed to Levi Ullery, by Deed recorded in Book 737, Page 229 of Deeds, Records of said County and running thence Easterly along the Southerly line of said land and the prolongation thereof, 345 feet more or less to the Westerly line of the land conveyed to Don W. Pratt, by Deed recorded in Book 3305, Page 202 of Deeds, Records of said County; thence Northerly along the Westerly line of the land conveyed to said Don W. Pratt, 126.251 feet; thence Westerly parallel with the line first described 345 feet, more or less, to the Easterly line of said College Road; and thence Southerly along the Easterly line of said Road, 126.251 feet to the place of beginning.

Excepting therefrom the Northerly 60 feet thereof.

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

# PREPAYMENT RIDER

Loan Number: L171142

Date: JANUARY 2, 2018

Borrower(s): PHILIP H. INMAN

THIS PREPAYMENT RIDER (the "Rider") is made this 2nd    day of JANUARY    ,
2018    , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
PKN INVESTMENTS, LLC

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

12066 DOWNEY AVENUE, DOWNEY, CALIFORNIA 90241
[Property Address]

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.    PREPAYMENT CHARGE**
The Note provides for the payment of a prepayment charge as follows:

### 4.  BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment."  When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so.  I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note.  However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment.  However, any reduction due to my partial Prepayment may be offset
by an interest rate increase.

CALIFORNIA PREPAYMENT RIDER
(CIVIL CODE PROVISION)
12/13/05                                    Page 1 of 2

*DocMagic eForms*
*www.docmagic.com*

Capr.ppf.xml

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

If within SIX ( 6 ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds TWENTY percent ( 20.000 %) of the original principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX ( 6 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds TWENTY percent ( 20.000 %) of the original principal amount of the loan.

If the Note contains provisions for a variable interest rate, the purpose of the loan is to finance the purchase or construction of real property containing four or fewer residential units or on which four or fewer residential units are to be constructed, and the Note Holder is not a "supervised financial organization," as defined in California Civil Code Section 1916.5, then I may prepay the loan in whole or in part without a Prepayment charge within 90 days of notification of any increase in the rate of interest.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)         _____ (Seal)
PHILIP H. INMAN                -Borrower                              -Borrower

_____ (Seal)         _____ (Seal)
                               -Borrower                              -Borrower

_____ (Seal)         _____ (Seal)
                               -Borrower                              -Borrower

CALIFORNIA PREPAYMENT RIDER
(CIVIL CODE PROVISION)
12/13/05                          Page 2 of 2

DocMagic *eForms*
www.docmagic.com

Capr.ppf.xml

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

——————————— [Space Above This Line For Recording Data] ———————————

Loan Number: L171142

# BALLOON RIDER

THIS BALLOON RIDER is made this   2nd   day of   JANUARY 2018                       , and
is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Note (the "Note") to   PKN INVESTMENTS, LLC

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

12066 DOWNEY AVENUE, DOWNEY, CALIFORNIA 90241
[Property Address]

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the "Note
Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or
anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive
payments under the Note is called the "Note Holder."

ADDITIONAL COVENANTS.  In addition to the covenants and agreements in the Security
Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary
contained in the Security Instrument or the Note):

THIS LOAN IS PAYABLE IN FULL AT MATURITY.  YOU MUST REPAY THE ENTIRE
PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS
UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.  YOU WILL,
THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY
OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE
THIS LOAN WITH, WILLING TO LEND YOU THE MONEY.  IF YOU REFINANCE THIS LOAN
AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS
NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM
THE SAME LENDER.

MULTISTATE BALLOON RIDER
04/26/04
Page 1 of 2

DocMagic *eForms*
www.docmagic.com

Usb.rdr.xml

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider.

_____    _____
Borrower PHILIP H. INMAN    Date      Borrower        Date

_____    _____
Borrower        Date      Borrower        Date

_____    _____
Borrower        Date      Borrower        Date

MULTISTATE BALLOON RIDER
04/26/04

Page 2 of 2

DocMagic *eForms*
www.docmagic.com

Usb.rdr.xml

100

DECLARATION OF SCOTT A. SCHIFF
EXHIBIT 2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 16255 Ventura Blvd., Suite 708, Encino, CA 91436.


A true and correct copy of the foregoing document entitled (*specify*): ***NATIONAL LOAN ACQUISITIONS COMPANY'S OBJECTIONS TO CONFIRMATION OF DEBTOR'S ORIGINAL CHAPTER 13 PLAN; DECLARATION OF COLIN THOMPSON; DECLARATION OF SCOTT A. SCHIFF*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_3/14/2024_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

| | |
|---|---|
| Kelli M Brown | kbrown@ghidottiberger.com, bknotifications@ghidottiberger.com |
| Amrane (SA) Cohen (TR) | efile@ch13ac.com |
| Jon Alan Enochs | jenochs@enochslaw.com, enochs_paralegal@enochslaw.com |
| Scott A Schiff | sas@soukup-schiff.com |
| Sunita N Sood | sunitansood@hotmail.com, seemasood@gmail.com |
| United States Trustee (SA) | ustpregion16.sa.ecf@usdoj.gov |

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **_3/14/2024_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

American Express National Bank, c/o Becket and Lee LLP, PO Box 3001, Malvern PA 19355-0701

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **_3/14/2024_**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Mark D. Houle, United States Bankruptcy Court, 3420 Twelfth Street, Suite 325, Riverside, CA 92501

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/14/2024 | Angie Martinez | */s/Angie Martinez* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |


This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                              **F 9013-3.1.PROOF.SERVICE**

## 2. **SERVED BY UNITED STATES MAIL**:

Franchise Tax Board
Bankruptcy Section MS A340
PO Box 2952
Sacramento, CA 95812-2952

HOAG Property Management Inc
10551 Paramount Blvd
Downey, CA 90241-2499

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

IRS
Department of Treasury
PO Box 16226
Philadelphia, PA 19114-0226

Planet Home Lending
321 Research Pkwy #303
Elizabethtown, PA 17022

Philip H Inman
2042 Palmetto Terrace
Fullerton, CA 92831-1251

Pinehurst at Coyote Hills
c/o Revolve Property Management
2013 East Orangethorpe Ste A
Placentia, CA 92870-6765

SJO Investments, LLC
c/o The Enochs Law Group, APC
7777 Alvarado Road Ste 624
La Mesa, CA 91942-8286

Sunita N Sood
2107 N Broadway Ste 306
Santa Ana, CA 92706-2634

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**